# EXHIBIT 1



|  | **Ironshore Insurance Services LLC.** |
|---|---|
|  | A subsidiary of Ironshore Holdings (U.S.) Inc. |
|  | 5105 DTC Parkway |
|  | Suite 312 |
|  | Greenwood Village, CO 80111 |

February 2, 2022

Steven Riss
AMWINS INSURANCE BROKERAGE OF CALIFORNIA, LLC
21550 Oxnard Street
Woodland Hills, CA 91367

|  |  |
|---|---|
| **Re:** | Tewksbury Living Group LLC dba Wood Haven Senior Living |
|  | 2850 Main Street |
|  | Tewksbury, MA 01876 |
| **Line Of Business:** | LTC - Primary |
| **Policy Number:** | HC7SACFPT3001 |
| **Policy Term:** | 1/1/2022 TO 1/1/2023 |

Dear Steven:

Enclosed please find the policy for the above referenced account. We appreciate your consideration of Ironshore. Feel free to contact me with any questions or concerns.

Sincerely,

Adam Beach
Sr. Production Specialist
Ironshore Insurance Services LLC.
Office: +1 (303) 802-8881
Mobile: +1 (815) 348-0043
Email: adam.beach@ironshore.com



**IRONSHORE SPECIALTY INSURANCE COMPANY**

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**This policy is insured by a company which is not admitted to transact insurance in the commonwealth, is not supervised by the commissioner of insurance and, in the event of an insolvency of such company, a loss shall not be paid by the Massachusetts Insurers Insolvency Fund under chapter 175D.**

# LONG TERM CARE ORGANIZATIONS PROFESSIONAL LIABILITY, GENERAL LIABILITY, EMPLOYEE BENEFITS LIABILITY AND REGULATORY PROCEEDING DEFENSE COVERAGE DECLARATIONS

THIS IS A CLAIMS MADE LIABILITY POLICY - PLEASE READ THE ENTIRE POLICY CAREFULLY.

**Policy Number:** HC7SACFPT3001

| ITEM 1.  NAMED INSURED AND PRINCIPAL ADDRESS | ITEM 2.  POLICY PERIOD |
|---|---|
| Tewksbury Living Group LLC dba Wood Haven Senior Living<br>2850 Main Street<br>Tewksbury, MA 01876 | (a)  **Inception Date:** January 01, 2022<br>(b)  **Expiration Date:** January 01, 2023<br>At 12:01 a.m. Standard Time both dates at the Principal Address stated in ITEM 1. |

**ITEM 3.  RETROACTIVE DATES**

| | | |
|---|---|---|
| A) | Professional Liability: | April 01, 2019 |
| B) | General Liability: | April 01, 2019 |
| C) | Employee Benefits Liability: | April 01, 2019 |
| D) | Evacuation Expense Reimbursement : | January 01, 2022 |
| E) | Public Relations Expense Reimbursement : | January 01, 2022 |
| F) | Resident Loss of Property Reimbursement : | January 01, 2022 |
| G) | Regulatory Proceedings: | January 01, 2022 |

**ITEM 4.  LIMITS OF LIABILITY**

**A)  Professional Liability**

| | |
|---|---|
| Each Claim Limit of Liability: | $1,000,000 |
| Aggregate Limit of Liability: | $3,000,000 |
| | |
| Each Claim Self Insured Retention: | $0 |
| Aggregate Self Insured Retention: | $0 |

**B)  General Liability**

Each Claim Limit of Liability:                  $1,000,000

Aggregate Limit of Liability:                   $3,000,000
    Products Completed Ops Limit:            ☒  Included
    Personal Injury and Advertising Injury Limit:   ☒  Included
    Fire Damage Each Claim:                  $100,000
    Fire Damage Aggregate:                   $100,000
    Medical Expense for Bodily Injury caused
        by accident Each Person:            $10,000
    Medical Expense for Bodily Injury caused
        by accident Aggregate                $25,000
Each Claim Self Insured Retention:              $0
Aggregate Self Insured Retention:               $0
    Medical Expenses Self Insured Retention:    nil

**C)  Employee Benefits Liability**

Each Claim Limit of Liability:                  $1,000,000
Aggregate Limit of Liability:                   $3,000,000

Each Claim Self Insured Retention:              $100
Aggregate Self Insured Retention:               $0

**D)  Evacuation Expense Reimbursement**

Each Claim Limit of Liability:                  $25,000
Aggregate Limit of Liability:                   $25,000

Each Claim Self Insured Retention:              $5,000
Aggregate Self Insured Retention:               $0

**E)  Public Relations Expense Reimbursement**

Each Claim Limit of Liability:                  $25,000
Aggregate Limit of Liability:                   $25,000

Each Claim Self Insured Retention:              $5,000
Aggregate Self Insured Retention:               $0

**F)  Resident Loss of Property Reimbursement**

Each Claim Limit of Liability:                  $5,000
Aggregate Limit of Liability:                   $25,000

Each Claim Self Insured Retention:              $0
Aggregate Self Insured Retention:               $0

**G)  Regulatory Proceedings (Defense Expenses Only)**

Each Claim Limit of Liability:                  $250,000
Aggregate Limit of Liability:                   $250,000

Each Claim Self Insured Retention:              $0
Aggregate Self Insured Retention:               $0

**ITEM 5.  PREMIUM:**

*Compliance with all surplus lines placement requirements, including stamping the Policy and collection and payment of surplus lines taxes, is the responsibility of the broker.*

| | |
|---|---|
| Professional Liability: | $48,952.00 |
| General Liability: | $4,548.00 |
| Terrorism Coverage (TRIA): | $0.00 |
| ----------------------- | ------------------ |
| Total Amount Due: | $53,500.00 |

*See Invoice for the date Premium is due and payable.  Failure to pay the premium in full may result in voidance of coverage.*

☐ This amount is net of commission – no percentage of the premium will be paid to the broker.
☒ This amount includes commission – a percentage of the premium will be paid to the broker.

**ITEM 6.  NOTICES UNDER SECTION IV OF THE POLICY SHOULD BE ADDRESSED TO:**

USCLAIMS@IRONSHORE.COM

Vice President of Claims
IronHealth
175 Powder Forest Drive,
Weatogue, CT 06089

All other notices under the Policy should be addressed to:
Underwriting Department
IronHealth
175 Powder Forest Drive,
Weatogue, CT 06089

**ITEM 7.  POLICY FORM & ENDORSEMENTS ATTACHED AT ISSUANCE**

LTC.COV.025 (4.17 ed.) Long Term Care Organizations Professional Liability, General Liability, Employee Benefits Liability And Regulatory Proceeding Defense

**ENDORSEMENTS ATTACHED AT ISSUANCE**

1. ADM-OFAC-0419 - Sanction Limitation and Exclusion Clause
2. LTC.P.012 (3.09 Ed.) Amend Definition of Named Insured
3. LTC.P.059 (6.11 ed.) Blanket Additional Insured - GL Only
4. LTC.P.080 (10.09 Ed.) Minimum Earned Premium
5. LTC.END.210 (9.16 ed.) Punitive Damages Exclusion
6. LTC.END.242 (4.17 ed.) Disinfection Event Expense Reimbursement Coverage
7. LTC.END.350 (12.20 ed.) Amend Professional Services to Include COVID-19 testing
8. LTC.END.356 (4.21 ed.) Pandemic/Epidemic/Scheduled Infectious Disease Exclusion
9. TRIA-E002-0315 Cap on Losses From Certified Acts of Terrorism
10. TRIA-N004-0420 Disclosure - Terrorism Risk Insurance Act
11. Service of Suit Clause - Massachusetts - SC-9 (11_18)
12. LTC.P.019 (5.08 ed.) Additional Insured Endorsement
13. LTC.END.160 (11.12 ed.) Amend Retro Date for Specific Named Insured

**These Declarations, the completed signed Application and the Policy with Endorsements shall constitute the contract between the Insured and the Underwriter.**

Ironshore Specialty Insurance Company

**BY:** _____
     **Authorized Signature**

**DATE:** <u>February 4, 2022</u>



## IRONSHORE
### A Liberty Mutual Company

### IRONSHORE SPECIALTY INSURANCE COMPANY
175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Insured Name:** Tewksbury Living Group LLC dba Wood Haven Senior Living
**Policy Number:** HC7SACFPT3001

# LONG TERM CARE ORGANIZATIONS PROFESSIONAL LIABILITY, GENERAL LIABILITY, EMPLOYEE BENEFITS LIABILITY AND REGULATORY PROCEEDING DEFENSE COVERAGE POLICY

**PORTIONS OF THIS POLICY ARE "CLAIMS MADE," APPLYING ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED AND REPORTED TO THE INSURER DURING THE POLICY PERIOD.  PLEASE READ THIS POLICY CAREFULLY.**

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the insurance company identified in the Declarations to this Policy (the "Insurer"), and subject to all of the terms and conditions of this Policy (including all endorsements hereto), the Insurer and the **Insured** agree as follows:

I.      **INSURING AGREEMENTS**

(A)     **Claims Made Professional Liability Insurance:**

The Insurer will pay on behalf of the **Insured** any **Loss** that the **Insured** is legally obligated to pay as a result of any covered **Claim** for a **Professional Services Wrongful Act** happening on or after the **Retroactive Date,** provided that the **Claim** is first made against the **Insured** during the **Policy Period** or applicable **Extended Reporting Period**, and subject to the applicable Limit of Liability.

(B)     **Claims Made General Liability Insurance; Medical Expense Payments:**

(1)     The Insurer will pay on behalf of the **Insured** any **Loss** that the **Insured** is legally obligated to pay as a result of any covered **Claim** alleging **Bodily Injury**, **Property Damage**, **Advertising Injury** or **Personal Injury** happening on or after the **Retroactive Date,** provided that the **Claim** is first made against the **Insured** during the **Policy Period** or applicable **Extended Reporting Period**, and subject to the applicable Limit of Liability.

(2)     The Insurer will pay on behalf of the **Insured Medical Expenses** which are actually incurred, and for which the claimant is financially responsible, for **Bodily Injury** caused by an accident:

(a)     on premises owned or rented by the **Named Insured**; or

(b)     on ways adjacent to premises owned or rented by the **Named Insured**; or

(c)     because of the operations of the **Named Insured**;

*provided* that:

(i)     such accident takes place in the coverage territory and during the **Policy Period**;

(ii)    **Medical Expenses** are incurred and reported to the Insurer within one year of the date of the accident; and

          (iii)  the injured person submits to examination, as often as required by the Insurer, by physicians of the Insurer's choice and at the expense of the Insurer.

(C)      **Claims Made Employee Benefits Liability Insurance:**

The Insurer will pay on behalf of the **Insured** any **Loss** that the **Insured** is legally obligated to pay as a result of any covered **Claim** for an **Employee Benefits Wrongful Act** happening on or after the **Retroactive Date,** provided that the **Claim** is first made against the **Insured** during the **Policy Period** or applicable **Extended Reporting Period**, and subject to the applicable Limit of Liability.

(D)      **Evacuation Expense Reimbursement Insurance:**

Upon satisfactory proof of payment by the **Named Insured**, the Insurer will reimburse the **Named Insured** up to the amount set forth in ITEM 4(D) of the Declarations for **Evacuation Expense** actually paid by the **Named Insured** during the **Policy Period** in connection with an **Evacuation** occurring after the **Retroactive Date**.

(E)      **Public Relations Expense Reimbursement Insurance:**

Upon satisfactory proof of payment by the **Named Insured**, the Insurer will reimburse the **Named Insured** up to the amount set forth in ITEM 4(E) of the Declarations for **Public Relations Expense** actually paid by the **Named Insured** during the **Policy Period** in connection with a **Public Relations Event** occurring after the **Retroactive Date,** provided that the Insurer will have no liability whatsoever for fines, penalties, assessments of costs or other financial awards associated with any such **Public Relations Event**.

(F)      **Resident Loss of Property Reimbursement Insurance:**

Upon satisfactory proof of payment by the **Named Insured**, the Insurer will reimburse the **Named Insured** up to the amount set forth in ITEM 4(F) of the Declarations for **Resident Loss of Property** actually paid by the **Named Insured** during the **Policy Period.**

(G)      **Claims Made Regulatory Proceeding Defense Coverage:**

The Insurer will reimburse the **Named Insured** for **Defense Expenses** incurred by the **Insured** as a result of an **Eligible Regulatory Proceeding** first instituted against the **Insured** during the **Policy Period** or applicable **Extended Reporting Period**, subject to the Limit of Liability set forth in ITEM 4(G) of the Declarations

(H)      **Duty to Defend and Supplementary Payments:**

The Insurer has the right and duty to defend any **Claim** that is covered by INSURING AGREEMENTS (A), (B), and (C) of this Policy, even if any of the allegations of such **Claim** are groundless, false or fraudulent. In addition to the applicable Limit of Liability for INSURING AGREEMENTS (A), (B), and (C), the Insurer will pay **Defense Expenses** and will:

(1)     pay the premium on any bond to release attachments for an amount not in excess of the Limit of Liability for INSURING AGREEMENTS (A), (B), and (C) of this Policy and the premium on any appeal bond required in any defended suit, provided, that the Insurer will not be obligated to apply for or furnish any such bond;

(2)     pay all costs taxed against the **Insured** in any such suit;

(3)     provide a legal defense and pay **Defense Expenses** for any arbitration, mediation or other alternative dispute proceeding if:

         (a)    the dispute at issue is a **Claim** covered by this Policy, and

         (b)    the **Insured** provides notice of the proceeding as required by GENERAL CONDITION (A)(3) of this Policy; and

(4)     pay reasonable expenses, plus loss of earnings due to time off from work, incurred by an **Insured** as a result of being a defendant or co-defendant in a **Claim** or at the Insurer's request, but not to exceed:

     (a)     $500 per day per **Insured**; and

     (b)     $12,500 per **Claim**.

(I)     **Defense and Settlement:**

(1)     No **Insured** shall, except at its own cost, incur any expense, make any payment, admit liability for, assume any obligation, or settle any **Claim**, or incur any **Defense Expenses** for an **Eligible Regulatory Proceeding**, without the Insurer's written consent. With respect to any **Claim**, the Insurer will have the right to investigate, direct the defense, and conduct settlement negotiations it deems appropriate. The Insurer may make any settlement of any **Claim** which it deems appropriate.

(2)     The Insurer will have no obligation to pay **Loss** or **Defense Expenses,** or continue to direct the defense of any **Insured**, after the applicable Limit of Liability has been exhausted by the payment of **Loss** (or **Defense Expenses** with respect to any **Eligible Regulatory Proceeding**).  If the applicable Limit of Liability is exhausted by the payment of **Loss** (or **Defense Expenses** with respect to any **Eligible Regulatory Proceeding),** the premium for this Policy will be fully earned.

(3)     If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred, either because a **Claim** made against the **Insureds** includes both covered and uncovered matters, or because a **Claim** is made against both **Insureds** and others not included within the definition of "**Insured**," the **Named Insured** and the Insurer agree to use their best efforts to determine a fair and proper allocation of all such amounts.  The Insurer's obligation to pay **Loss** under this Policy shall relate only to those sums allocated to the **Insureds**.  In making such determination, the parties shall take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim** by the **Named Insured** and others.  In the event that the Insurer and the **Named Insured** do not reach an agreement with respect to an allocation, then the Insurer shall be obligated to make an interim payment of the amount of **Loss** which the parties agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

**II.**     **DEFINITIONS APPLICABLE TO ALL COVERAGE PARTS**

(A)     "**Administration**" as used in connection with **Employee Benefits Programs** shall mean the following acts if authorized by the **Named Insured**:

(1)     giving counsel to **Employees** with respect to **Employee Benefits Programs**;

(2)     interpreting the **Employee Benefits Programs**;

(3)     handling records and processing of **Claims** in connection with the **Employee Benefits Programs**; and

(4)     effecting enrollment, termination or cancellation of **Employees** under **Employee Benefits Programs**.

(B)     "**Advertising Injury**" means injury arising out of an **Advertising Injury Offense**,

(C)     "**Advertising Injury Offense**" means one or more of the following offenses:

(1)     oral or written publication of material that slanders or libels a person or an organization or disparages a person's or an organization's goods, products or services;

(2)     oral or written publication of material that violates a person's right of privacy;

(3)    misappropriation of advertising ideas or style of doing business; or

(4)    false, incorrect or misleading publication by the **Named Insured** concerning the type, scope or quality of **Medical Services** offered by the **Named Insured**, alleged in connection with **Bodily Injury**.

(D)    "**Application**" means the application for insurance attached to and forming part of this Policy, including any materials submitted and statements made in connection therewith, all of which are on file with the Insurer and are a part of this Policy, as if physically attached. If the **Application** uses terms or phrases that differ from terms defined in this Policy, no inconsistency between any terms or phrase used in the **Application** and any term defined in this Policy will waive or change any of the terms, conditions and limitations of this Policy.

(E)    "**Beauticians and Barbers Professional Services**" means those services rendered by any **Covered Beautician/Barber** in his or her capacity as such.

(F)    "**Beauticians and Barbers Professional Services Wrongful Act**" means any actual or alleged act, error or omission, or series of acts, errors or omissions, by a **Covered Beautician/Barber** in the performance or failure to perform **Beauticians and Barbers Professional Services** that results in **Bodily Injury to a Resident;**

(G)    "**Bodily Injury**" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time; mental anguish; and mental injury.

(H)    "**Claim**" means any written notice received by an **Insured** that a person or entity intends to hold an **Insured** responsible for a **Wrongful Act** committed or allegedly committed on or after the applicable **Retroactive Date**. **Claim** does not include a **Regulatory Proceeding.**

(I)    "**Covered Beautician/Barber**" means any licensed beautician or barber who is not an **Employee** of the **Named Insured** but who is invited by the **Named Insured** onto the **Named Insured's** premises to perform **Beauticians and Barbers Professional Services**, but only while performing such **Beauticians and Barbers Professional Services** at the request of the **Named Insured** on the **Named Insured's** premises;

(J)    "**Covered Contract**" means any lease of premises; sidetrack agreement; elevator maintenance agreement; easement of license agreement; obligation to indemnify a municipality if the obligation is required by ordinance; contract or agreement under which the **Named Insured** assumes the tort liability of a municipality to pay damages for **Bodily Injury** or **Property Damage** covered by this Policy that is sustained by others.

(K)    "**Defense Expenses**" means reasonable fees and expenses of attorneys, experts and consultants incurred in the investigation, adjustment, defense and/or appeal of a **Claim** or an **Eligible Regulatory Proceeding** with the approval or at the direction of the Insurer; provided that **Defense Expenses** shall not include:

(1)    remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of any **Insured**;

(2)    any amounts incurred in defense of a **Claim** for which any other insurer has a duty to defend, regardless whether such other insurer undertakes such duty; or

(3)    any benefits under an **Employee Benefits Program**.

(L)    "**Eligible Regulatory Proceeding**" means a **Regulatory Proceeding** that includes allegations of **Bodily Injury** to one or more person(s) as a result of a **Professional Services Wrongful Act(s)** committed or allegedly committed on or after the applicable **Retroactive Date**.

(M)    "**Employee**" means any person who has an assigned work schedule for and is either (i) on the regular payroll of the **Named Insured**, with federal and state taxes withheld, or (ii) a person employed by a labor leasing firm or self-employed, and leased by the **Named Insured** under a written agreement with such labor leasing firm or person to perform duties at the **Named Insured's** location and under the direction of the **Named Insured**. Other than a person described in clause (ii) above, independent contractors are not **Employees**. An **Employee's** status as an

**Insured** shall be determined as of the date of the **Wrongful Act** upon which a **Claim** involving the **Employee** is based.

(N)  "**Employee Benefits Programs**" means any group life insurance, group accident and health insurance, profit sharing plans, pension plans, **Employee** stock subscription plans, workers' compensation, unemployment insurance, social security and disability benefits insurance or any other similar plan under the **Administration** of the **Named Insured**.

(O)  "**Employee Benefits Wrongful Act**" means any actual or alleged act, error or omission, or series of acts, errors or omissions, by any **Insured** in the **Administration** of an **Employee Benefits Program**.

(P)  "**Employment Practices**" means any of the following: breach of any employment contract; failure or refusal to hire or employ; dismissal, discharge, reduction in force, downsizing or termination of employment, whether actual or constructive; demotion, reassignment, failure or refusal to promote, or deprivation of career opportunity; discipline of **Employees**; evaluation of **Employees**; discrimination or harassment of any kind or on any basis including, but not limited to, discrimination, limitation, segregation or classification based on race, sex, marital status, ancestry, physical or mental handicaps, age, sexual preference, pregnancy or religion or other status that is protected under any applicable federal, state or local statute or ordinance affecting any present or former **Employee** or applicant for employment; humiliation or defamation of any present or former **Employee** or applicant for employment; retaliatory treatment against an **Employee** arising out of the **Employee's** attempted or actual exercisof the **Employee's** rights under the law; employment-related misrepresentations; or failure to implement appropriate workplace or employment policies or procedures.

(Q)  "**Evacuation**" means the removal from one or more of the **Named Insured's** facilities to any other location of a majority of the **Residents** of such facility(ies) as a result of any natural or man-made occurrence that, in the reasonable judgment of the **Named Insured's** management, causes or could potentially cause such facility(ies) to be unsafe for such **Residents**.

(R)  "**Evacuation Expense**" means reasonable costs incurred in connection with an **Evacuation**, including costs associated with transporting and lodging **Residents** who have been evacuated.   **Evacuation Expense** does not include any remuneration, salaries, overhead or benefit expenses of the **Named Insured**.

(S)  "**Extended Reporting Period**" means the period of time after the **Policy Period** for reporting any **Claim** for a **Wrongful Act** that happened after the **Retroactive Date** and before the termination of the **Policy Period**.

(T)  "**Fire Damage**" means **Property Damage** resulting from a **Hostile Fire**.

(U)  "**First Named Insured**" means the entity designated as such in ITEM 1 of the Declarations.

(V)  "**Government Agency**" means any federal or state governmental entity or agent acting with legal authority to implement, administer and/or enforce particular legislation, including but not limited to statutes, regulations, directives and bulletins.

(W)  "**HIPAA Violation**" means any proceeding brought by a **Government Agency** (other than proceedings in the ordinary course of the **Named Insured's** business) alleging a violation of the privacy provisions of the Health Insurance Portability and Accountability Act of 1996 (HIPAA).

(X)  "**Hostile Fire**" means a fire which becomes uncontrollable or breaks out from where it was intended to be contained; provided, that **Hostile Fire** does not include any fire that originates at any site operating as a waste disposal facility or waste storage facility.

(Y)  "**Insured**" means any of the following:

   (1)  the **Named Insured**;

(2)     any **Employee** or **Volunteer**; but only when such **Employee** or **Volunteer** is acting within the capacity and scope of his or her duties as such for the **Named Insured**;

(3)      any medical director of the **Named Insured**, whether or not such person is an **Employee**;

(4)     any member of a duly authorized board or any committee of the **Named Insured**; any person communicating information to the **Named Insured** or its medical or professional staff for the purpose of aiding in the evaluation of **Professional Services** or the qualifications, professional competence, fitness, or character of an applicant for membership or privileges on such medical or professional staff or for purposes of initiating corrective action; or any person charged with the duty of acting as a hearing officer or an agent of a judicial review committee or executing directives of any such board or committee but, in each case, only when such person is acting within the capacity and scope of his or her duties to such board or committee;

(5)     any **Covered Beautician/Barber**;

(6)     solely with respect to and limited to coverage afforded under INSURING AGREEMENT (A), the lawful spouses of individual **Insureds** and, in the event of the death, incapacity, or bankruptcy of an individual **Insured** the estates, heirs, legal representatives or assigns of such individual **Insured**;

(7)     any person enrolled as a student in a formal training program offered by the **Named Insured** or a subsidiary or an affiliate in connection with the **Named Insured's** on-site operation as a health care organization or provider but only for such person's legal liability arising from the performance of, or failure to perform, duties relating to the on-site training program in which he or she is enrolled;

(8)     any driver or operator of **Mobile Equipment** but only when operating **Mobile Equipment** at the direction and with the permission of the **Named Insured**; and

(9)     Solely with respect to, and limited to, coverage afforded under INSURING AGREEMENT (B), any person or organization for whom the **Named Insured** is performing operations when the **Named Insured** and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an "additional insured" on this Policy; *provided*, that each such person or organization is being afforded coverage under this Policy for liability incurred *solely* as a result of the acts, errors or omissions of the original **Insured**; and *provided further*, that no coverage will be available under this Policy for any **Claim** based on or arising out of any actual or alleged independent or direct liability of any such person or organization.

(Z)     "**Loss**" means **Public Relations Expenses, Evacuation Expenses, Medical Expenses** for **Bodily Injury** caused by an accident, and any damages, settlements, judgments or other amounts (including punitive or exemplary damages where insurable by law) in excess of the applicable Retention, if any, stated in ITEM 4 of the Declarations and not exceeding the applicable Limit of Liability stated in ITEM 4 of the Declarations which an **Insured** is legally obligated to pay as a result of a **Claim**.  **Loss** shall not include:

(1)     **Defense Expenses**;

(2)     the multiple portion of any multiplied damage award;

(3)     fines, penalties, sanctions, fees, government payments or taxes; except that the **Insurer** will pay fines, penalties, sanctions, fees, government payments or taxes as result of any **HIPAA Violation** up to the amount set forth in ITEM 4E of the Declarations;

(4)     amounts owed to any provider of **Medical Services** under any contract;

(5)     restitution, return or disgorgement of fees, profits, charges for products or services rendered, capitation payments, premium or any other funds allegedly wrongfully held or obtained;

(6)    benefits under an **Employee Benefits Plan**;

(7)    relief or redress in any form other than monetary compensation or monetary damages, including without limitation the cost of complying with any injunctive, declaratory or administrative relief; or

(8)    matters which are uninsurable under applicable law.

(AA)    "**Medical Expenses**" means reasonable payments for:

(1)    first aid administered at the time of an accident;

(2)    necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3)    necessary ambulance, hospital, professional medical and nursing, and funeral services.

(BB)    "**Medical Services**" means services performed by an Insured in the treatment and/or care of any resident including:

(1)    medical (other than surgical), dental, psychiatric, mental health, chiropractic, osteopathic, nursing, personal, residential or other professional health care;

(2)    the furnishing of food or beverages in connection with such care;

(3)    the furnishing or dispensing of medications, drugs, blood, blood products, or medical (other than surgical), dental, or psychiatric supplies, equipment, or appliances in connection with such care, including on site telemedicine **Resident** monitoring equipment; and

(4)    the handling of, or the performance of post-mortem examinations on, human bodies.

(CC)    "**Mobile Equipment**" means any of the following types of land vehicles, including any attached machinery or equipment:

(1)    bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

(2)    vehicles maintained for use solely on or next to premises owned or rented by an **Insured**;

(3)    vehicles that travel on crawler treads;

(4)    vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

    (a)    power cranes, shovels, loaders, diggers or drills, or

    (b)    road construction or resurfacing equipment such as graders, scrapers or rollers;

(5)    vehicles not described in clauses (1)-(4) above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

    (a)    air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

    (b)    cherry pickers and similar devices used to raise or lower workers; and

(6)    vehicles not described in clauses (1)-(4) above maintained primarily for purposes other than the transportation of persons or cargos. **Mobile Equipment** does not include self-propelled vehicles with the following types of permanently attached equipment:

(a) equipment designed primarily for:

    (i) snow removal;

    (ii) road maintenance but not construction or resurfacing; or

    (iii) street cleaning;

(b) cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(c) air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

(DD) "**Named Insured**" means the **First Named Insured** and any other entity designated as a **Named Insured** in ITEM 1 of the Declarations.

(EE) "**Occurrence**" means an **Advertising Injury Offense**, a **Personal Injury Offense**, and any accident, including continuous or repeated exposure to the same harmful conditions, which results in injury or damage neither expected nor intended by the **Insured**.

(FF) "**Personal Injury**" means injury, other than **Bodily Injury**, arising out of one or more **Personal Injury Offense(s)**.

(GG) "**Personal Injury Offense**" means any of the following offenses:

(1) false arrest, detention or imprisonment;

(2) malicious prosecution;

(3) the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

(4) oral or written publication of material that slanders or libels a person or an organization or disparages a person's or an organization's goods, products or services; or

(5) oral or written publication of material that violates a person's right of privacy.

(HH) "**Policy Period**" means the period from the Inception Date of this Policy stated in ITEM 2(a) of the Declarations to the Expiration Date of this Policy stated in ITEM 2(b) of the Declarations or to any earlier cancellation date of this Policy.

(II) "**Pollutant**" means smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, medical waste, waste materials (including materials which are intended to be or have been recycled, reconditioned or reclaimed) or other irritants, pollutants or contaminants. **Pollutant** does not include smoke, fumes, vapor or soot emanating from equipment used to heat or cool a building owned or operated by the **Named Insured**.

(JJ) "**Professional Services**" means:

(1) **Medical Services**;

(2) the activities of an **Insured** as a member of a formal accreditation, standards review or similar professional board or committee, including executing the directives of such board or committee;

(3) reviewing the quality of **Medical Services** or providing quality assurance on behalf of the **Named Insured**;

(4) **Beauticians and Barbers Professional Services;** and

(5)    General care, control, supervision and providing for safety and security of a person while a **Resident** of the **Insured.**

(KK)    "**Professional Services Wrongful Act**" means:

(1)    any actual or alleged act, error or omission, or series of acts, errors or omissions, by an **Insured** in rendering, or failing to render, **Professional Services** to a **Resident** that results in **Bodily Injury**;

(2)    any **Beauticians and Barbers Professional Services Wrongful Act**; and

(3)    any actual or alleged violation by an **Insured** of any **Rights of Residents,** that results in **Bodily Injury**.

(LL)    "**Property Damage**" means:

(1)    physical injury to tangible property, including all resulting loss of use of that property; provided, that such loss of use shall be deemed to have occurred at the time of the physical injury that caused it; or

(2)    loss of use of tangible property that is not physically injured; provided, that such loss of use shall be deemed to occur at the time of the **Occurrence** that caused it.

(MM)    "**Public Relations Expense**" means reasonable fees and costs incurred in the investigation, mitigation and/or defense of an actual or alleged **Public Relations Event**.  **Public Relations Expense** includes costs (a) of attorneys, experts and consultants, including third-party media consultants; (b) to notify third parties directly affected by such **Public Relations Event**; (c) associated with credit monitoring services; and (d) incurred in the management of public relations with respect to such **Public Relations Event.  Public Relations Expense** does not include any remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of the **Named Insured**.

(NN)    "**Public Relations Event**" means:

(1)    any **HIPAA Violation**, or any other failure to maintain the confidentiality of information regarding **Medical Services** or information obtained in the provision of **Professional Services,** or unauthorized release or use of such information; or

(2)    any criminal investigation, criminal complaint, indictment or licensing proceeding relating to an alleged violation or infringement of one or more state or federal statutes or regulations regarding:

(a)    elder abuse;

(b)    **Resident** privacy, including the handling of protected health information;

(c)    hiring practices and reference checking with respect to potential employees; or

(d)    any other similar law or regulation applicable to operations of the **Named Insured** and intended to protect the rights or safety of elderly persons and persons in long-term care facilities;

in any such case resulting in **Bodily Injury**.

(OO)    "**Regulatory Proceeding**" means an action, subpoena, or request for monetary or injunctive relief made by or on behalf of any one or more **Government Agency(ies),** whether brought in the name of such **Government Agency(ies)** or by or on behalf of such **Government Agency(ies)** in the name of any other individual or entity.

(PP)    "**Related Claims**" means:

(1)    **Claims** for **Wrongful Acts**, and

(2)      **Claims** for **Bodily Injury**, **Property Damage**, **Advertising Injury** or **Personal Injury** caused by **Wrongful Acts;** and

(3)      **Eligible Regulatory Proceedings;**

based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions, or events or the same or related series of facts, circumstances, situations, transactions, or events, whether related logically, causally, or in any other way, in any combination, whether or not involving more than one policy, practice, procedure or product, including any course of treatment, and whether or not deemed a continuous tort.  Notwithstanding the foregoing, no **Eligible Regulatory Proceeding** shall be considered a **Related Claim** to any **Claim** which is not an **Eligible Regulatory Proceeding.**

(QQ)    "**Resident**" means any person being cared for or residing at a facility of the **Named Insured**.

(RR)    "**Resident Loss of Property**" means any loss of, or damage to, personal property of a **Resident** occurring at a facility of the **Named Insured**.

(SS)    "**Retroactive Date**" means the applicable date set forth in ITEM 3 of the Declarations.

(TT)    "**Rights of Residents**" means:

(1)      any right granted to a nursing home **Resident** under any state law regulating the **Named Insured's** business as a residential health care facility; or

(2)      rights of **Residents** as set forth in the United States Department of Health and Welfare regulations governing participation of Intermediate Care Facilities or Skilled Nursing Facilities, regardless of whether the **Named Insured's** facility is subject to such regulations.

(UU)    "**Volunteer**" means a person who provides his or her services or labor to the **Named Insured**, and whose activities are supervised and directed by the **Named Insured**, but who does not have a contract to provide and is not compensated for such services and labor. No **Insured Medical Practitioner**, **Employee** or staff physician shall be considered a **Volunteer**.

(VV)    '**Wrongful Act**" means any **Professional Services Wrongful Act** or **Employee Benefits Wrongful Act**.

**III.    EXCLUSIONS**

(A)     **Exclusions Applicable to INSURING AGREEMENT (A):**

In addition to the EXCLUSIONS listed under (D) below, no coverage will be available under INSURING AGREEMENT (A), and the Insurer will not pay any **Loss** or **Defense Expenses** under INSURING AGREEMENT (A), for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)      discrimination of any kind on any basis, including, but not limited to, discrimination, limitation, segregation or classification based on race, sex, marital status, ancestry, physical or mental handicaps, age, sexual preference, pregnancy, religion or other status that is protected under any applicable federal, state or local statute or ordinance affecting any present or former **Employee** or applicant for employment except to the extent that such discrimination relates to the rendering of, or failure to render, **Professional Services**;

(2)      **Property Damage;**

(3)      **Bodily Injury** expected or intended from the standpoint of any **Insured**; except this EXCLUSION (A)(3) will not apply

(a)    to **Bodily Injury** resulting from use of reasonable force to protect persons or property, and

(b)    in the event of any **Claim** for elder abuse and/or sexual misconduct, to

(i)    any **Insured** who did not personally participate in such elder abuse or sexual misconduct, and

(ii)    the vicarious liability of the **Named Insured** for such elder abuse or sexual misconduct.

(4)    **Advertising Injury** or **Personal Injury**, except (a) to the extent that such injury relates to the rendering of, or failure to render, **Professional Services**, and (b) with respect to any **Advertising Injury Offense** described in DEFINITION (C)(4).

(5)    **Employee Benefits Wrongful Acts;**

(6)    rendering of, or failure to render, **Medical Services** by any **Insured** while the **Insured's** license to practice is or was not active;

(7)    violation of the Employee Retirement Income Security Act of 1974 (ERISA), the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, all as may be amended, or any similar federal, state or local statutory or common law, or any rules or regulations promulgated thereunder; except this EXCLUSION (A)(7) will not apply to any **Claim** arising out of the rendering of, or failure to render, **Medical Services**, which is otherwise covered under INSURING AGREEMENT (A) of this Policy and for which reimbursement for such services was received from health care plans covered by such statutes, rules or regulations; or

(8)    **Regulatory Proceeding**

(B)    **Exclusions Applicable to INSURING AGREEMENT (B):**

In addition to the EXCLUSIONS listed under (D) below, no coverage will be available under INSURING AGREEMENT (B), and the Insurer will not pay any **Loss** or **Defense Expenses** under INSURING AGREEMENT (B), for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)    **Professional Services Wrongful Act**;

(2)    discrimination of any kind on any basis, including, but not limited to, discrimination, limitation, segregation or classification based on race, sex, marital status, ancestry, physical or mental handicaps, age, sexual preference, pregnancy, religion or other status that is protected under any applicable federal, state or local statute or ordinance affecting any present or former **Employee** or applicant for employment;

(3)    **Bodily Injury**, **Property Damage**, **Personal Injury** or **Advertising Injury** expected or intended from the standpoint of any **Insured**;  except this EXCLUSION (B)(3) will not apply

(a)    to **Bodily Injury** resulting from use of reasonable force to protect persons or property, and

(b)    in the event of any **Claim** for alleged sexual misconduct, to

(i)    any **Insured** who did not personally participate in such sexual misconduct, and

(ii)    the vicarious liability of the **Named Insured** for such sexual misconduct.

(4)    **Personal Injury** or **Advertising Injury** arising out of oral or written publication of material:

(a)    if done by or at the direction of an **Insured** with knowledge of its falsity; or

(b)    whose first publication took place before the Inception Date set forth in ITEM 2 of the Declarations;

(5)    **Advertising Injury** arising out of any false, incorrect or misleading description of the price of goods, products or services;

(6)    **Employee Benefits Wrongful Acts**;

(7)    **Bodily Injury** or **Property Damage** arising out of:

(a)    the ownership, maintenance, use, operation or entrustment to others of any aircraft, auto, watercraft, motor vehicle or semi-trailer or the loading or unloading thereof; except to the extent such injury arises from the loading or unloading of **Residents** or relates to the maintenance or use of non-owned aircraft, watercraft or motor vehicles but only as excess cover over any other insurance, whether collectible or not;

(b)    the transportation of **Mobile Equipment** by, in or on an auto owned or operated by, or rented or loaned to, any **Insured**;

(c)    the use of **Mobile Equipment** in, or while in practice or preparation for, any prearranged racing, speed, demolition or stunt activity; or

(d)    any consequence, direct or indirect, of war, invasion, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power, strike, riot or civil insurrection;

except that EXCLUSION (B)(7)(a) above does not apply to golf carts or similar vehicles owned or leased by the **Named Insured**, and operated by any **Employee** or **Volunteer** of the **Named Insured** (i) in the ordinary course of the **Named Insured's** business as a retirement facility or community, and (ii) solely on premises owned or leased by the **Named Insured**;

(8)    **Property Damage** to:

(a)    property the **Insured** owns, rents or occupies;

(b)    premises sold, given away or abandoned by the **Named Insured**, if the **Property Damage** arises out of any part of those premises;

(c)    property loaned to the **Insured**;

(d)    personal property in the care, custody or control of the **Insured**, subject, however, to coverage afforded under INSURING AGREEMENT (F);

(e)    that particular part of real property on which the **Insured**, or any contractor or subcontractor working directly or indirectly on the **Insured's** behalf, is performing operations, if the **Property Damage** arises out of those operations;

(f)    property which is being transported by the **Insured** by automobile, **Mobile Equipment** or team, including the loading and unloading thereof; or

(g)    a delay or failure by an **Insured** or anyone acting on the **Named Insured's** behalf to perform a contract or an agreement in accordance with its terms;

except that:

EXCLUSION (B)(8)(a) above does not apply to **Fire Damage**, subject to the applicable Limit of Liability set forth in ITEM 4 of the Declarations; and

EXCLUSIONS (B)(8)(c), (d) and (e) above do not apply to liability assumed under a sidetrack agreement.

(9)     injury or damage arising in whole or in part, either directly or indirectly, out of asbestos, regardless whether the asbestos is:

   (a)     airborne as a fiber or particle;

   (b)     contained in a product;

   (c)     carried or transmitted on clothing or by any other means; or

   (d)     contained in or a part of:

      (i)     any building;

      (ii)     any building material;

      (iii)     any insulation product; or

      (iv)     any component part of any building, building material or insulation product;

(10)   (a)     exposure to, or generation, storage, manifestation, transportation, discharge, emission, release, dispersal, seepage, migration, escape, appearance, presence, reproduction, growth of, treatment, removal or disposal of, any **Pollutant**, except where such exposure, generation, storage, manifestation, transportation, discharge, emission, release, dispersal, seepage, migration, escape, appearance, presence, reproduction, growth, treatment, removal or disposal was caused by an unintentional fire or any heat, smoke or fumes issuing from such unintentional fire;

   (b)     fee, cost, expense or charge to test, monitor, clean up, remediate, mitigate, remove, contain, treat, detoxify, neutralize or rehabilitate any **Pollutant**;

   (c)     fee, cost, expense, charge, fine or penalty incurred, sustained or imposed by order, direction, request or agreement of any court, governmental agency, regulatory body or civil, public or military authority in connection with or in any way relating to any Pollutant;

   except this EXCLUSION (B)(10) will not apply to any **Claim** for **Bodily Injury** or **Property Damage** caused by heat, smoke or fumes from a **Hostile Fire**;

(11)   violation of the Employee Retirement Income Security Act of 1974 (ERISA), the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, all as may be amended, or any similar federal, state or local statutory or common law, or any rules or regulations promulgated thereunder; except this EXCLUSION (B)(11) will not apply to a **Claim** arising out of the rendering of, or failure to render, **Medical Services**, which is otherwise covered under INSURING AGREEMENT (A) of this Policy and for which reimbursement for such services was received from health care plans covered by such statutes, rules or regulations;

(12)   nuclear reaction, nuclear radiation, radioactive contamination, or radioactive substance;

(13)   **Bodily Injury** sustained by:

   (a)     any **Insured** other than a **Volunteer**;

(b)    any person hired to do work for or on behalf of any **Insured** or tenant of any **Insured**;

(c)    any person injured on that part of premises owned or rented by the **Named Insured** that the person normally occupies;

(d)    any person injured while engaging in athletic activities; or

(e)    any person to the extent that benefits for the injury are payable or must be provided by worker's compensation, disability, government-sponsored health insurance (including, without limitation, Medicare and Medicaid) or any similar health insurance plan or coverage; provided that clause (e) shall not be construed to reduce or eliminate the Insurer's obligation to satisfy valid government liens via payment directly to the applicable government agency;

except this EXCLUSION (B)(13) shall apply only to the coverage afforded under clause (2) of INSURING AGREEMENT (B);

(14)    **Regulatory Proceeding;** or

(15)    **Bodily Injury** sustained by a **Resident**.

(C)    **Exclusions Applicable to INSURING AGREEMENT (C):**

In addition to the Exclusions listed in EXCLUSION (D) below, no coverage will be available under INSURING AGREEMENT (C), and the Insurer will not pay any **Loss** or **Defense Expenses** under INSURING AGREEMENT (C),  for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)    **Bodily Injury** or **Property Damage**;

(2)    failure of performance by any insurer;

(3)    failure of securities or other investments to perform as represented or advice given to an **Employee** to participate or not to participate in stock subscription or other benefit programs; provided, that for purposes of this EXCLUSION (C)(3), "security" means a security of any nature whatsoever including, without limitation, stocks, shares, bonds, debentures, options, derivatives, partnership interests, limited liability company interests, any other form of debt or equity instrument and any other forms of ownership interest;

(4)    insufficiency of funds to meet any obligations of **Employee Benefits Programs**;

(5)    discrimination of any kind on any basis, including, but not limited to, discrimination, limitation, segregation or classification based on race, sex, marital status, ancestry, physical or mental handicaps, age, sexual preference, pregnancy, religion or other status that is protected under any applicable federal, state or local statute or ordinance affecting any present or former **Employee** or applicant for employment;

(6)    **Professional Services Wrongful Acts**;

(7)    violation of the Employee Retirement Income Security Act of 1974 (ERISA), the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, all as may be amended, or any similar federal, state or local statutory or common law, or any rules or regulations promulgated thereunder; or

(8)    **Regulatory Proceeding.**

(D)    **Exclusions Applicable to All INSURING AGREEMENTS:**

Except as otherwise expressly provided in this Policy, this Policy does not apply to, and the Insurer will not pay **Loss** or **Defense Expenses** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)  **Wrongful Act or Occurrence** that happened before the **Retroactive Date** if applicable, or after the **Retroactive Date** if, on the Inception Date of this Policy, the **Insured** knew, had been told, should have known or had notified a prior insurer or administrator of any other risk transfer instrument that such **Wrongful Act or Occurrence** would or could result in a **Claim** or **Regulatory Proceeding**; *provided, however*, that if this Policy is a renewal of one or more policies previously issued by the Insurer to the **Named Insured,** and the coverage provided by the Insurer to the **Named Insured** was in effect, without interruption, for the entire time between the inception date of the first such other policy and the Inception Date of this Policy, the reference in this EXCLUSION (D)(1) to the Inception Date will be deemed to refer instead to the inception date of the first policy under which the Insurer began to provide the **Named Insured** with the continuous and uninterrupted coverage of which this Policy is a renewal;

(2)  violation of any federal, state or local antitrust, restraint of trade, unfair competition, or price-fixing law, or any rules or regulations promulgated thereunder, or any involvement in any agreement or conspiracy to restrain trade, except for any **Claim** otherwise covered under INSURING AGREEMENT (A) arising out of the rendering of, or failure to render, **Professional Services**;

(3)  dishonest, fraudulent, criminal or intentionally malicious act, error or omission by an **Insured**; any willful violation of law, statute, rule or regulation by an **Insured**; or the gaining of any profit, remuneration or advantage by any **Insured** to which such **Insured** was not legally entitled, including, but not limited to, health care fraud; provided, however, that no such act of one **Insured** will be imputed to any other **Insured** who was not aware of and did not participate in such act;

(4)  obligation for which the **Named Insured** or any other insurer may be liable under workers' compensation, unemployment compensation, disability benefits or any similar law;

(5)  obligation which an **Insured** has assumed under a written or oral contract or agreement; except this EXCLUSION (D)(5) will not apply to:

   (a)  liability an **Insured** would have had in the absence of such contract or agreement; or

   (b)  liability assumed by the **Named Insured** under a **Covered Contract**;

(6)  **Claim** made by or for the benefit of, or in the name or right of, one current or former **Insured** against another current or former **Insured**;

(7)  **Employment Practices**;

(8)  liability of any subsidiary as described in GENERAL CONDITION (F) or its **Insured Persons** acting in their capacity as such for any **Claim**, **Occurrence**, **Regulatory Proceeding**, fact, circumstance, situation, transaction, event or **Wrongful Act** or series of **Claims**, **Occurrences**, **Regulatory Proceedings**, facts, circumstances, situations, transactions, events or **Wrongful Acts** happening before the date such entity became a subsidiary;

(9)  (a)  access to, collection of, release of, disclosure of any person's or organization's confidential or personal information, including patient's lists, financial information, credit card information, health or medical information or any other type of nonpublic information; including but not limited to violations of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and any amendments thereto, whether the claim is made by or on behalf of a private individual, entity, or government agency; or

   (b)  loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate "Electronic Data" (as defined below);

except this EXCLUSION (D)(9) will not apply to the coverage afforded under INSURING AGREEMENT (E).  For purposes of this EXCLUSION, the term "Electronic Data" means any information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are or may be used with electronically controlled equipment or other electronic backup facilities, and data transmission or storage by means of the Internet.  "Electronic Data" is not tangible property.

(10)     liability of any individual acting as an independent contractor for an **Insured**; except this EXCLUSION (D)(10) will not apply to (a) liability of any medical director of the **Named Insured**, and (b) any **Claim** based upon the actual or alleged vicarious liability of an **Insured;**

(11)     infringement of any right of patent, service mark, trademark, copyright, title or slogan;

(12)     fungi or bacteria, including mold or mildew, any mycotoxins, toxins, allergens, spores, scents, vapors, gases or by-products released by fungi, regardless of whether such fungi is airborne, in soil or water or contained in or a part of any building, structure, building material, or any component part of any of the foregoing; or

(13)     violation of the federal Telephone Consumer Protection Act (TCPA), including any rules or regulations amendment of or additions thereof, or equivalent state or local laws.

**IV.      GENERAL CONDITIONS**

(A)     **Limits of Liability**

(1)     Insuring Agreement (A) – Professional Liability

(a)     The "Each Claim" amount stated in ITEM 4(A) of the Declarations will be the Insurer's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (A).

(b)     The "Aggregate for all Claims" amount stated in ITEM 4(A) of the Declarations will be the Insurer's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (A).

(2)     Insuring Agreement (B) – General Liability; Medical Expenses

(a)     The applicable "Each Claim" (or "Each Person") amount stated in ITEM 4(B) of the Declarations:

(i)     With respect to General Liability, **Personal Injury** and **Advertising Injury,** will be the Insurer's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** under any such coverage for which this Policy provides coverage under INSURING AGREEMENT (B);

(ii)    With respect to **Fire Damage**, will be the Insurer's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** under such **Fire Damage** coverage for which this Policy provides coverage under INSURING AGREEMENT (B); and

(iii)   With respect to **Medical Expenses** for **Bodily Injury** caused by an accident, will be the Insurer's maximum Limit of Liability for all such **Medical Expenses** per person resulting from an accident for which this Policy provides coverage under INSURING AGREEMENT (B).

(b)     The applicable "Aggregate" amount stated in ITEM 4(B) of the Declarations:

(i)     With respect to General Liability, **Personal Injury** and **Advertising Injury,** will be the Insurer's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** under all such coverages for which this Policy provides coverage under INSURING AGREEMENT (B);

     (ii)   With respect to **Fire Damage**, will be the Insurer's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** under such **Fire Damage** coverage for which this Policy provides coverage under INSURING AGREEMENT (B); and

     (iii)   With respect to **Medical Expenses** for **Bodily Injury** caused by an accident, will be the Insurer's maximum Limit of Liability for all such **Medical Expenses** resulting from all such accidents for which this Policy provides coverage under INSURING AGREEMENT (B).

  (c)   The amounts applicable to **Fire Damage** and **Medical Expenses** for **Bodily Injury** caused by an accident, as set forth above, shall be part of, and not in addition to, the Insurer's maximum aggregate Limit of Liability set forth in clause b.1. above.

(3)   Insuring Agreement (C) – Employee Benefit Liability

  (a)   The "Each Claim" amount stated in ITEM 4(C) of the Declarations will be the Insurer's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (C).

  (b)   The "Aggregate for all Claims" amount stated in ITEM 4(C) of the Declarations will be the Insurer's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (C).

(4)   Insuring Agreement (D) – Evacuation Expense

  (a)   The "Each Claim" amount stated in ITEM 4(D) of the Declarations will be the Insurer's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (D).

  (b)   The "Aggregate for all Claims" amount stated in ITEM 4(D) of the Declarations will be the Insurer's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (D).

(5)   Insuring Agreement (E) – Public Relations Expense

  (a)   The "Each Claim" amount stated in ITEM 4(E) of the Declarations will be the Insurer's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (E).

  (b)   The "Aggregate for all Claims" amount stated in ITEM 4(E) of the Declarations will be the Insurer's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (E).

(6)   Insuring Agreement (F) – Resident Loss of Property

  (a)   The "Each Claim" amount stated in ITEM 4(F) of the Declarations will be the Insurer's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (F).

  (b)   The "Aggregate for all Claims" amount stated in ITEM 4(F) of the Declarations will be the Insurer's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (F).

(7)   Insuring Agreement (G) – Regulatory Proceedings

  (a)   The "Each Claim" amount stated in ITEM 4(G) of the Declarations will be the Insurer's maximum Limit of Liability for all **Defense Expenses** resulting from each **Regulatory Proceeding** for which this Policy

provides coverage under INSURING AGREEMENT (G).

   (b)   The "Aggregate for all Claims" amount stated in ITEM 4(G) of the Declarations will be the Insurer's maximum Limit of Liability for all **Defense Expenses** resulting from all **Regulatory Proceedings** for which this Policy provides coverage under INSURING AGREEMENT (G).

(8)   Each Limit of Liability described in paragraphs (1) through (7) above shall apply regardless of the time of payment by the Insurer, the number of persons or entities included within the definition of "**Insured,**" or the number of claimants, and regardless of whether such **Claim** or **Related Claims** is/are first made during the **Policy Period** or during any **Extended Reporting Period.**

(9)   The **Insured** shall be responsible for payment in full of the applicable deductible or self-insured retention stated in ITEM 4 of the Declarations, and the Insurer's obligation to pay **Loss** or **Defense Expenses** under this Policy shall be excess of such deductible or self-insured retention.  The applicable deductible or self-insured retention shall apply to each **Claim** or **Related Claims** or **Eligible Regulatory Proceeding** (subject to the applicable aggregate deductible or self-insured retention amount, if any.  The Insurer shall have no obligation whatsoever, either to the **Insured** or any other person or entity, to pay all or any portion of the applicable deductible or self-insured retention on behalf of the **Insured**. The Insurer shall, however, at its sole discretion, have the right and option to do so, in which event the **Insured** will repay the Insurer any amounts so paid.

(10)  All **Insureds** under this Policy share the Limit of Liability. In no event will the number of **Insureds** involved in a **Claim** or **Related Claims** increase the Limit of Liability.

(11)  If any **Claim** made against the **Insured** gives rise to coverage both under this Policy and under any other policy or policies issued by the Insurer or any affiliate of the Insurer, the Insurer's and, if applicable, such affiliate's maximum aggregate limit of liability under all such policies for all **Loss** in respect of such **Claim** will not exceed the largest single available limit of liability under any such policy, including this Policy. In no event will more than one policy issued by the Insurer respond to a **Claim**.

(12)  In the event a **Claim** made against the **Insured** gives rise to coverage under both INSURING AGREEMENT A and INSURING AGREEMENT B,  the Insurer's maximum liability will not exceed the largest single available limit of liability under either INSURING AGREEMENT.

(B)   **Related Claims Deemed Single Claim:**

All **Related Claims**, whenever made, shall be deemed to be a single **Claim**, regardless of:

(1)   the number of **Related Claims**;

(2)   the number or identity of claimants;

(3)   the number or identity of **Insureds** involved or against whom **Related Claims** have been or could be made;

(4)   whether the **Related Claims** are asserted in a class action or otherwise; and

(5)   the number and timing of the **Related Claims**, even if the **Related Claims** comprising such single **Claim** were made in more than one **Policy Period**.

All **Related Claims** will be treated as a single **Claim** made when the earliest of such **Related Claims** was first made, or when the earliest of such **Related Claims** is treated as having been made in accordance with GENERAL CONDITION (C)(1)(b) below, whichever is earlier.

(C)   **Reporting of Claims, Eligible Regulatory Proceedings, Occurrences and Circumstances:**

(1)   With respect to the coverage afforded under INSURING AGREEMENTS (A), (B) and (C), as a condition

precedent to any right to payment of the **Insured** under this Policy, the following will apply

(a) If, during the **Policy Period** or any **Extended Reporting Period,** any **Claim** is first made against any **Insured**, as a condition precedent to its right to any coverage under this Policy, the **Insured** shall give the Insurer written notice of such **Claim** as soon as practicable thereafter, but in no event later than:

(i) sixty (60) days after the Expiration Date or earlier cancellation date of this Policy except that if the **Insured** does not renew or cancels coverage under the Policy, notice must be given no later than the Policy Expiration date or cancellation date; or

(ii) the expiration of any **Extended Reporting Period**.

Timely and sufficient notice by one **Insured** of a **Claim** shall be deemed timely and sufficient notice for all **Insureds** involved in the **Claim**. Such notice shall give full particulars of the **Claim**, including, but not limited to, a description of the **Claim**; the identity of the **Resident**, all potential claimants, the health care provider(s) and any **Insureds** involved; a description of the injury or damages alleged in the **Claim**; and information on the time, place and nature of the **Wrongful Ac(s)** or **Occurrence(s)** underlying the **Claim.**

(b) If during the **Policy Period** the **Insured** first becomes aware of any **Wrongful Act** or **Occurrence** that may subsequently give rise to a **Claim** and:

(i) gives the Insurer written notice of such **Wrongful Act** or **Occurrence** with full particulars as soon as practicable thereafter but in any event before the Expiration Date or earlier cancellation date of this Policy; and

(ii) requests coverage under this Policy for any **Claim** subsequently arising from such **Wrongful Act** or **Occurrence**;

then any **Claim** not otherwise excluded by this Policy subsequently made against the **Insured** arising out of such **Wrongful Act** or **Occurrence** shall be treated as if it had been first made during the **Policy Period**. Full particulars of the **Wrongful Act** or **Occurrence** shall include, but not be limited to, information on the time, place and nature of the **Wrongful Act** or **Occurrence**; the identity of the **Resident**; all potential claimants and the health care provider(s) and any **Insureds** involved; the manner in which the **Insured** first became aware of such **Wrongful Act** or **Occurrence**; and the reasons the **Insured** believes the **Wrongful Act** or **Occurrence** is likely to result in a **Claim.**

(2) With respect to the coverage afforded under INSURING AGREEMENT (G), as a condition precedent to any right to payment of the **Insured** under this Policy, the following will apply:

(a) If, during the **Policy Period** or any **Extended Reporting Period,** any **Eligible Regulatory Proceeding** is first made against any **Insured**, as a condition precedent to its right to any coverage under this Policy, the **Insured** shall give the Insurer written notice of such **Eligible Regulatory Proceeding** as soon as practicable thereafter, but in no event later than:

(i) sixty (60) days after the Expiration Date or earlier cancellation date of this Policy except that if the **Insured** does not renew or cancels coverage under the Policy, notice must be given no later than the Policy Expiration date or cancellation date; or

(ii) the expiration of any **Extended Reporting Period**.

Timely and sufficient notice by one **Insured** of an **Eligible Regulatory Proceeding** shall be deemed timely and sufficient notice for all **Insureds** involved in the **Eligible Regulatory Proceeding**. Such notice shall give full particulars of the **Eligible Regulatory Proceeding**, including, but not limited to, a description of the **Eligible Regulatory Proceeding**; the identity of all potential claimants and any **Insureds** involved; a description of the damages alleged; and information on the time, place and

nature of the **Regulatory Proceeding** underlying the **Eligible Regulatory Proceeding.**

(b)    If during the **Policy Period** the **Insured** first becomes aware of any **Regulatory Proceeding** that may give rise to an **Eligible Regulatory Proceeding** and:

    (i)    gives the Insurer written notice of such **Regulatory Proceeding** with full particulars as soon as practicable thereafter but in any event before the Expiration Date or earlier cancellation date of this Policy; and

    (ii)    requests coverage under INSURING AGREEMENT (E) for any **Eligible Regulatory Proceeding** arising from such **Regulatory Proceeding**;

then any **Eligible Regulatory Proceeding** not otherwise excluded by this Policy subsequently made against the **Insured** arising out of such **Regulatory Proceeding** shall be treated as if it had been first made during the **Policy Period**. Full particulars of the **Regulatory Proceeding** shall include, but not be limited to, information on the time, place and nature of the **Regulatory Proceeding**; the identity of all potential claimants and any **Insureds** involved; the manner in which the **Insured** first became aware of such **Regulatory Proceeding**; and the reasons the **Insured** believes the **Regulatory Proceeding** is likely to result in an **Eligible Regulatory Proceeding**.

(3)    Notwithstanding anything to the contrary contained in this Policy, if this Policy is a renewal of one or more policies previously issued by the Insurer to the **Named Insured,** and the coverage provided by the Insurer to the **Named Insured** was in effect, without interruption, for the entire time between the inception date of the first such other policy and the Inception Date of this Policy, the reference to the **Policy Period** in sub-clause (b) of clauses (1) and (2) above will be deemed to refer to the period from (i) the inception date of the first policy under which the Insurer began to provide the **Named Insured** with the continuous and uninterrupted coverage of which this Policy is a renewal, to (ii) the Expiration Date set forth in ITEM 2(b) of the Declarations.

(D)    **Territory:**

This policy applies to **Wrongful Acts** or **Occurrences** taking place anywhere in the world. **Claim** or suit must be made against an **Insured**, however, in the United States of America, including its territories or possessions, Puerto Rico, or Canada.

(E)    **Mergers, Acquisitions or Newly Created Entities:**

If, during the **Policy Period,** the **Named Insured** acquires or creates another entity or subsidiary or becomes a member of a joint venture or partner in a partnership, or if the **Named Insured** merges or consolidates with another entity such that the **Named Insured** is the surviving entity (any of which events is referred to as a "Transaction" in this GENERAL CONDITION (E)), the Insurer will have the option of providing coverage in respect of such entity or subsidiary, and no coverage will be afforded under this Policy for any **Claim** or **Eligible Regulatory Proceeding** in any way involving the entity or subsidiary that is acquired, created, merged or consolidated with, unless:

(1)    the **Named Insured** gives the Insurer notice of such Transaction as soon as possible but in no event later than ninety (90) days after the effective date of the Transaction;

(2)    the **Named Insured** gives the Insurer such information regarding the Transaction as the Insurer requests; and

(3)    the **Named Insured** accepts any terms, conditions, exclusions, and limitations and pays any additional premium as the Insurer, at its sole discretion, imposes.

If the Insurer, at its sole discretion, elects to provide coverage in respect of such entity or subsidiary, this Policy shall not apply to, and the Insurer will not pay any **Loss** or **Defense Expenses** for, any **Eligible Regulatory**

**Proceeding,** or any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any **Occurrence** or **Wrongful Act,** happening before:

    (a)    the effective date of the Transaction; or

    (b)    the effective date of coverage under this Policy for such entity or subsidiary as set forth in an endorsement to be issued to extend coverage to such entity or subsidiary, whichever is later.

For purposes of this GENERAL CONDITION (E), "subsidiary" means any entity for which the **Named Insured** owns or possesses fifty percent (50%) of the issued and outstanding capital stock, or has or controls the right to elect or appoint more than fifty percent (50%) of the directors or trustees.

(F)    **Sales or Dissolution of Insured Entities; Cessation of Business:**

If, during the **Policy Period**:

(1)    the **Named Insured** is dissolved, sold, acquired by, merged into, or consolidated with another entity such that the **Named Insured** is not the surviving entity; or

(2)    any person, entity, or affiliated group of persons or entities obtains:

    (a)    ownership or possession of fifty percent (50%) of the issued and outstanding capital stock of the **Named Insured,** or;

    (b)    the right to elect or appoint more than fifty percent (50%) of the **Named Insured's** directors or trustees; or

    (c)    if the **Named Insured** ceases to do business for any reason;

(any of which events is referred to as a "Transaction" in this GENERAL CONDITION (F) coverage under this Policy shall continue in full force and effect until the Expiration Date or any earlier cancellation date, but this Policy shall apply only to **Occurrences** or **Wrongful Acts** happening before the effective date of such Transaction. This Policy will not apply to, and the Insurer will not pay any **Loss** or **Defense Expenses** for, any **Eligible Regulatory Proceeding,** or any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any **Occurrence** or **Wrongful Act,** happening on or after the effective date of such Transaction.

(G)    **Extended Reporting Period:**

(1)    If this Policy is terminated by any party for any reason other than misrepresentation, fraud or nonpayment of premium, the **First Named Insured** shall have the right to purchase an **Extended Reporting Period.** In order to purchase the **Extended Reporting Period,** the **First Named Insured,** within thirty (30) days of the earlier of the effective date of termination or the date of any conversion of coverage under GENERAL CONDITION (F)(2), must (i) provide written notice by certified mail to the Insurer requesting the **Extended Reporting Period,** and (ii) pay any additional premium required by the Insurer promptly when due, together with any earned but unpaid premium which may be due under the terminated policy. The additional premium shall be deemed fully earned upon inception of the **Extended Reporting Period.**

(2)    The **Extended Reporting Period** will apply only with respect to any **Wrongful Act** or **Occurrence** committed, or **Regulatory Proceeding** happening, before the effective date of such termination or the date of any conversion of coverage under GENERAL CONDITION (F)(2), whichever is earlier. The **Extended Reporting Period** will not apply to:

    (a)    any **Claim** for **Professional Services** rendered before the **Retroactive Date** or after the termination date of this Policy;

    (b)    any **Claim** or proceedings pending as of the termination date of this Policy;

(c)    any paid **Claim**;

(d)    any **Wrongful Act, Occurrence** or **Regulatory Proceeding** that is covered under any subsequent insurance purchased by the **Insureds** or that would be covered but for exhaustion of the limit of liability applicable to such **Wrongful Act, Occurrence** or **Regulatory Proceeding** under such insurance;

(e)    any **Administration** of the **Insured's Employee Benefits Program** rendered before the **Retroactive Date** or after termination of this Policy; or

(f)    any **Wrongful Act or Occurrence** that happened before the **Retroactive Date** of this Policy.

(3)    If an **Extended Reporting Period** is purchased in accordance with clause (1) above, any **Claim** made during such **Extended Reporting Period** shall be deemed to have been made during the **Policy Period.** The Insurer's Limit of Liability in respect of **Claims** made during the **Extended Reporting Period** shall be part of, and not in addition to, the Insurer's **Limit of Liability** for all **Claims** made during the **Policy Period.** The **Extended Reporting Period** will not be deemed to extend the **Policy Period** or change the scope of coverage provided by this Policy.

(H)    **Cancellation; Non-Renewal:**

(1)    The Insurer may not cancel this Policy, except for non-payment of premium, in which case ten (10) days written notice shall be given.

(2)    The **First Named Insured** may cancel this Policy by mailing the Insurer written notice stating when, not later than the Expiration Date set forth in ITEM 2(b) of the Declarations, such cancellation will be effective. In such event, except as set forth in GENERAL CONDITION (L), the earned premium will be computed in accordance with the customary short rate table and procedure. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

(3)    The Insurer will not be required to renew this Policy upon its expiration.

(I)    **Assistance and Cooperation:**

In the event of a **Claim**, the **Insured** shall provide the Insurer with all information, assistance and cooperation that the Insurer reasonably requests. At the Insurer's request, the **Insured** shall assist in investigating, defending and settling **Claims**; enforcing any right of contribution or indemnity against another who may be liable to any **Insured**; and the conduct of actions, suits, appeals or other proceedings, including, but not limited to, attending trials, hearings and depositions; securing and giving evidence; and obtaining the attendance of witnesses.

(J)    **Subrogation:**

In the event of any payment hereunder, the Insurer shall be subrogated to the extent of any payment to all of the rights of recovery of the **Insured**. The **Insured** shall execute all papers and do everything necessary to secure such rights, including the execution of any documents necessary to enable the Insurer effectively to bring suit in its name. The **Insured** shall do nothing that may prejudice the Insurer's position or potential or actual rights of recovery. The obligations of the **Insured** under this GENERAL CONDITION (J) shall survive the expiration or termination of the Policy.

(K)    **Other Insurance and Risk Transfer Arrangements:**

Any **Loss** or **Defense Expenses** resulting from any **Claim** insured under any other insurance policy or risk transfer instrument, including, but not limited to, self-insured retentions, deductibles, fronting arrangements, professional liability policies covering any of the **Named Insured's** medical staff, **Employees, Volunteers** or **Insured Medical Practitioners**, or other alternative arrangements which apply to the **Loss** or **Defense Expenses** shall be paid first by those instruments, policies or other arrangements. It is the intent of this Policy to apply only to **Loss** or **Defense**

**Expenses** that are more than the total limit of all deductibles, limits of liability, self-insured amounts or other insurance or risk transfer arrangements, whether primary, contributory, excess, contingent, fronting or otherwise and whether or not collectible. These provisions do not apply to other insurance policies or risk transfer arrangements written as specific umbrella or excess insurance over the Limit of Liability of this Policy. This Policy shall not be subject to the terms of any other policy of insurance or plan or program of self-insurance; and in no event will the Insurer pay more than the Limit of Liability set forth in ITEM 4 of the Declarations.

(L)    **Exhaustion:**

If the Insurer's Limit of Liability is exhausted by the payment of **Loss,** the premium will be fully earned, all obligations of the Insurer under this Policy will be completely fulfilled and exhausted, and the Insurer will have no further obligations of any kind or nature whatsoever under this Policy.

(M)    **Authorization and Notices:**

The **First Named Insured** will act on behalf of all **Insureds** with respect to the giving or receiving of any notices under this Policy; the payment of premiums to, and receiving of return premiums from, the Insurer; the receiving and acceptance of any endorsements issued to form a part of this Policy; and the exercising or declining to exercise any Discovery Period.

(N)    **Conformance:**

Any terms of this Policy that are in conflict with the laws or regulations of the state in which this Policy is issued are amended to conform with such laws or regulations.

(O)    **Representation; Incorporation of Application; Entire Agreement:**

The **Insureds** represent that the particulars and statements contained in the **Application** attached to this Policy are true, accurate and complete and agree that:

(1)    this Policy is issued and continued in force by the Insurer in reliance upon the truth of such representation;

(2)    those particulars and statements are the basis of this Policy; and

(3)    the **Application** and those particulars and statements are incorporated in and form a part of this Policy.

No knowledge or information possessed by any **Insured** shall be imputed to any other **Insured**, except for material facts or information known to the person or persons who signed the **Application**. In the event of any material untruth, misrepresentation or omission in connection with any of the particulars or statements in the **Application**, this Policy shall be void with respect to any **Insured** who knew of such untruth, misrepresentation or omission or to whom such knowledge is imputed.

(P)    **No Action against Insurer:**

(1)    No action shall be taken against the Insurer by any **Insured** unless, as conditions precedent thereto, the **Insured** has fully complied with all of the terms of this Policy and the amount of the **Insured's** obligation to pay has been finally determined either by judgment against the **Insured** after adjudicatory proceedings or by written agreement of the **Insured**, the **Claim**ant and the Insurer.

(2)    No individual or entity shall have any right under this Policy to join the Insurer as a party to any **Claim** to determine the liability of any **Insured**; nor shall the Insurer be impleaded by an **Insured** or his, her, or its legal representative in any such **Claim**.

(Q)    **Notice:**

(1)    Notice to any **Insured** shall be sent to the **First Named Insured** at the address designated in ITEM 1 of the

Declarations.

(2)    Notice to the Insurer shall be sent to the address designated in ITEM 6 of the Declarations.

(R)    **Changes:**

Notice to or knowledge possessed by any agent or other person acting on behalf of the Insurer shall not effect a waiver or change in any part of this Policy or prevent or estop the Insurer from asserting any right(s) under this Policy. This Policy can only be altered, waived, or changed by written endorsement issued to form a part of this Policy.

(S)    **Insolvency of Insured:**

The Insurer will not be relieved of any of its obligations under this Policy by the bankruptcy or insolvency of any **Insured** or his/her/its estate.

(T)    **Inspections and Surveys:**

The Insurer or its duly authorized agent has the right but is not obliged to:

(1)    make inspections and surveys of the **Named Insured's** premises and operations at any time;

(2)    provide the **Insured** with reports on the conditions found;

(3)    recommend changes;

(4)    conduct loss control and prevention activity.

Any inspections, surveys, reports, or recommendations relate only to insurability and the premium to be charged.

The Insurer does not:

(a)    make safety inspections;

(b)    undertake to perform the duty of any entity to provide for the health or safety of workers or the public; nor

(c)    warrant that conditions:

(i)    are safe or healthy; or

(ii)    comply with laws, regulations or codes.

(U)    **Examination of Books and Records:**

The Insurer may examine and audit the books and records of the **Insured** as they relate to this Policy.

(V)    **Service of Suit:**

The Insurer hereby designates the Director of the Department of Insurance in the state in which this Policy is issued, and his/her successor(s) in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Insured** arising under or out of this Policy.

(W)    **Assignment:**

No assignment of interest under this Policy shall bind the Insurer without its written consent issued as an

endorsement to form a part of this Policy.

(X)    **Entire Agreement:**

The **Insureds** agree that this Policy, including the **Application** and any endorsements, constitutes the entire agreement between them and the Insurer or any of its agents relating to this insurance.

(Y)    **Headings:**

The descriptions in the headings and sub-headings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.

**In witness whereof the Insurer has caused this Policy to be executed by its authorized officers.**

Ironshore Specialty Insurance Company by:

Secretary                                              President

## IRONSHORE™
### A Liberty Mutual Company

**IRONSHORE SPECIALTY INSURANCE COMPANY**

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 1

**Policy Number:** HC7SACFPT3001                    **Effective Date of Endorsement:** January 01, 2022
**Insured Name:** Tewksbury Living Group LLC dba Wood Haven Senior Living

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SANCTION LIMITATION AND EXCLUSION CLAUSE

No Insurer shall be deemed to provide cover and no Insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that Insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

_____                    February 2, 2022
Authorized Representative                             Date



## IRONSHORE SPECIALTY INSURANCE COMPANY

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 2

**Policy Number:** HC7SACFPT3001                    **Effective Date of Endorsement:** January 01, 2022
**Insured Name:**  Tewksbury Living Group LLC dba Wood Haven Senior Living

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# AMEND DEFINITION OF "NAMED INSURED" TO INCLUDE ADDITIONAL ENTITIES

In consideration of the premium charged, the term "**Named Insured,**" as defined in Section II DEFINITIONS of the Policy, is amended to include each of the following entities, but solely with respect to **Wrongful Acts** committed or allegedly committed, or **Occurrences** happening, on or after the **Retroactive Date**:

### Additional Named Insured(s)

- Tewksbury Living Group, LLC dba Wood Haven Senior Living
- Esplanade Capital, LLC
- MH Tewksbury Operating LLC
- EC Senior Tewksbury Management LLC
- EC Tewksbury, LLC
- EF Senior Living Management, LLC
- EF LLC

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____                    February 2, 2022
Authorized Representative                    Date



## IRONSHORE SPECIALTY INSURANCE COMPANY

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 3

**Policy Number:** HC7SACFPT3001      **Effective Date of Endorsement:** January 01, 2022
**Insured Name:** Tewksbury Living Group LLC dba Wood Haven Senior Living

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# BLANKET ADDITIONAL INSURED – GL ONLY

In consideration of the premium charged,

1.  With respect to the coverage afforded under INSURING AGREEMENT (B) of this Policy, the term "**Insured**," as defined in the Policy, shall be deemed to include any person or organization for whom the **Named Insured** is performing operations when the **Named Insured** and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on this Policy.  For purposes of this endorsement, each such person or organization is referred to as an "**Additional Insured**."

2.  It is understood and agreed that each **Additional Insured** is being afforded coverage under this Policy for any liability incurred *solely* as a result of the acts, errors or omissions of the original **Insured**. No coverage will be available under this Policy for any **Claim** based on or arising out of any actual or alleged independent or direct liability of any **Additional Insured**.

3.  Provided that the **Insured** provides the Insurer with the identity of the **Additional Insured(s)**, the Insurer will provide such **Additional Insured(s)** with at least ten (10) days' written notice of cancellation or non-renewal of this Policy if such cancellation or non-renewal is for non-payment of premium, or sixty (60) days' written notice of cancellation or non-renewal if such cancellation or non-renewal is for any other reason.

- Meridian Senior Living, LLC
- Sino Ocean Meridian Holdings LLC
- BI 40, LLC
- KCP Advisory Group, LLC

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

_____
Authorized Representative

February 2, 2022
Date



## IRONSHORE SPECIALTY INSURANCE COMPANY

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 4

**Policy Number:** HC7SACFPT3001                                **Effective Date of Endorsement:** January 01, 2022
**Insured Name:** Tewksbury Living Group LLC dba Wood Haven Senior Living

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# MINIMUM EARNED PREMIUM ENDORSEMENT

In consideration of the premium charged, it is expressly understood and agreed that twenty-five percent (25%) of the premium amount set forth in ITEM 5 of the Declarations shall be deemed fully earned on and as of the Inception Date set forth in ITEM 2 of the Declarations.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____                    February 2, 2022
Authorized Representative                                             Date



# IRONSHORE
### A Liberty Mutual Company

**IRONSHORE SPECIALTY INSURANCE COMPANY**

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 5

**Policy Number:** HC7SACFPT3001                           **Effective Date of Endorsement:** January 01, 2022
**Insured Name:**  Tewksbury Living Group LLC dba Wood Haven Senior Living

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# PUNITIVE DAMAGES EXCLUSION

In consideration of the premium charged, no coverage will be available under this Policy for punitive or exemplary damages of any kind.  The definition of "**Loss**," set forth in Section II DEFINITIONS of this Policy, shall be deemed  amended to effect the purpose and intent of this endorsement.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

_____                February 2, 2022
Authorized Representative                               Date



**IRONSHORE SPECIALTY INSURANCE COMPANY**

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 6

**Policy Number:** HC7SACFPT3001          **Effective Date of Endorsement:** January 01, 2022
**Insured Name:** Tewksbury Living Group LLC dba Wood Haven Senior Living

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# DISINFECTION EVENT EXPENSE REIMBURSEMENT COVERAGE

In consideration of the premium charged,

1.  In the event that reasonable **Disinfection Expense** (as defined below) actually paid by the **Named Insured** during the **Policy Period** in connection with a **Disinfection Event** occurring during the **Policy Period** are not covered for any reason under any other policy or policies of insurance issued to the **Named Insured**, the **Insurer** shall reimburse the **Named Insured** for such **Disinfection Expense**, subject to the limits of liability set forth in paragraph (2) below and self-insured retention set forth in paragraph (3) below, and upon satisfactory proof of payment by the **Named Insured**.

2.  The **Insurer's** maximum aggregate limit for all **Disinfection Expense** resulting from all **Disinfection Event**s reimbursed under paragraph (1) above shall be $25,000, which amount is in addition to, and not part of, the Limits of Liability set forth in ITEM 4 of the Declarations. Payment of such maximum aggregate limit of liability shall terminate the **Insurer's** obligation to reimburse any further **Disinfection Expense** under paragraph (1) above.

3.  The **Insurer's** obligation to reimburse **Disinfection Expense** under paragraph (1) above shall be excess of a self-insured retention of $5,000 per **Disinfection Event**. The **Named Insured** shall be responsible for payment in full of such self-insured retention. The self-insured retention shall apply to each **Disinfection Event**, and shall be eroded (or exhausted) by the **Named Insured's** payment of **Disinfection Expense**.

4.  For purposes of this endorsement, the following terms shall have the meanings ascribed to them below:

    (a)  "**Disinfection Event**" means any case or series of cases of the MRSA virus, Legionella, or other facility-borne infectious virus, bacteria or disease that requires reporting of such case or series of cases to any local, state or federal governmental or healthcare oversight agency or entity.

    (b)  "**Disinfection Expense**" means reasonable fees and costs incurred by the **Named Insured** to investigate, remove, dispose of, abate, contain, treat, neutralize, monitor or test any contaminated water, surface or other media in or on the **Named Insured's** facility after any **Disinfection Event**.  Disinfection Expense includes costs (a) to engage third party providers of cleaning/disinfection services; (b) to notify patients/residents, visitors or other potentially affected persons; and (c) incurred in the management of public relations with respect to such **Disinfection Event**. Disinfection Expense does not include any remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of the **Named Insured**, or cost of cleaning/disinfecting supplies or products.

5.  The **Insurer** shall not be liable under this endorsement for any **Disinfection Expense** for which the **Named Insured** has coverage under any insurance policy other than this Policy, regardless of whether such policy is stated to be primary, contributory, excess, contingent, or otherwise.

6.  Neither EXCLUSION B(10) nor EXCLUSION D(12) shall be construed to limit or negate the coverage afforded under this endorsement.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

_____          February 2, 2022
Authorized Representative                          Date

**IRONSHORE**
A Liberty Mutual Company

**IRONSHORE SPECIALTY INSURANCE COMPANY**
175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement # 7**

**Policy Number:** HC7SACFPT3001                    **Effective Date of Endorsement:** January 01, 2022
**Insured Name:** Tewksbury Living Group LLC dba Wood Haven Senior Living

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMEND "PROFESSIONAL SERVICES" TO INCLUDE

# COVID-19 TESTING AND VACCINATION

In consideration of the premium charged, it is understood and agreed that the Policy is amended as follows:

1.  Section II. DEFINITIONS of the Policy is amended as follows:

    A.  The following is added to the definition of "**Professional Services**":

        "**Professional Services**" also means:

        a.  The provision or ordering of a **COVID-19 Test** for any resident or **Employee** of, or any visitor to, any location of the **Named Insured** for which coverage is afforded under this Policy (an "**Insured Location**"); and

        b.  The **COVID-19 Vaccination** of any resident or **Employee** of, or any visitor to, any **Insured Location**;

        such services shall be referred to as "**COVID-19 Services**."

    B.  The following is added to the end of the definition of "**Professional Services Wrongful Act**":

        Notwithstanding the foregoing, "**Professional Services Wrongful Act**" shall not include any actual or alleged omissions in, or failure to render, **COVID-19 Services**.

2.  Section III. EXCLUSIONS is amended as follows:

    A.  Solely with respect to any **Claim** based on or arising out of **COVID-19 Services**, Section III. EXCLUSION (D)(6) is deleted and replaced with the following:

"**Claim** made by or for the benefit of, or in the name or right of, one current or former **Insured** against another current or former **Insured**; *provided*, that this Exclusion will not apply to any **Claim** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **COVID-19 Services** by any current or former **Insured** to or for any other current or former **Insured**.

B.    The following is added to subsection (D):

Claim based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)   reliance, by any party, on the results of any **COVID-19 Test** or **COVID-19 Vaccination**; or

(2)   defect, deficiency or inadequate condition of any **COVID-19 Test** or vaccine approved by the U.S. Food and Drug Administration for the prevention of the virus/disease known as "Coronavirus Disease 19" or "COVID-19," or any side effects whatsoever from such test or vaccine.

3.   For purposes of this endorsement:

a.   "**COVID-19 Test**" means any diagnostic test designed to identify the presence or absence in the person being tested of the virus/disease known as "Coronavirus Disease 19" or "COVID-19."

b.   "**COVID-19 Vaccination**" means the administering of any vaccine approved by the U.S. Food and Drug Administration for the prevention of the virus/disease known as "Coronavirus Disease 19" or "COVID-19."

Notwithstanding anything to the contrary in the Policy, it is expressly understood and agreed that the coverage provided in this endorsement supersedes any exclusions in this Policy or its endorsements that may have otherwise applied to **COVID-19 Services**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

_____            February 2, 2022
Authorized Representative                           _____
                                                    Date

## IRONSHORE™
### A Liberty Mutual Company

**IRONSHORE SPECIALTY INSURANCE COMPANY**
175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 8

**Policy Number:** HC7SACFPT3001                                    **Effective Date of Endorsement:** January 01, 2022
**Insured Name:** Tewksbury Living Group LLC dba Wood Haven Senior Living

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# PANDEMIC/EPIDEMIC/SCHEDULED INFECTIOUS DISEASE EXCLUSION

In consideration of the premium charged, it is expressly understood and agreed that:

1. No coverage will be available under this Policy for any **Claim** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving a **Widespread Illness**, including, but not limited to, **Claims** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

    a. failure to prevent the transmission of any **Infectious Disease** that is a **Widespread Illness** by an **Insured**, an independent contractor who is providing services to, for, or on behalf of an **Insured,** a **Resident** or a visitor or anyone else for whom the **Insured** is alleged to be or found to be responsible, including, but not limited to, the failure to comply with or to implement any request, demand, order or applicable guidance of any local, state, or federal governmental authority or specialized agency created by treaty or charter;

    b. failure to diagnose, monitor or treat, or improper treatment of, any **Infectious Disease** that is a **Widespread Illness**;

    c. any act, error or omission in the furnishing, dispensing, distribution, administration or use of any vaccine or other preventative measure for an **Infectious Disease** that is a **Widespread Illness**;

    d. violation of **Rights of Residents** or other statutory violations in relation to or resulting from any **Widespread Illness**;

    e. rationing or withholding of **Professional Services**, due to a lack, shortage, limited availability, or following government directives; or unavailability of, or an inability to procure or otherwise obtain or retain any medications, personnel, equipment or supplies actually or allegedly occurring in relation to or resulting from any **Widespread Illness**;

    f. failure to report to any local, state, or federal government authority or warn any person of an **Infectious Disease** that is a **Widespread Illness**;

    g. failure to test, monitor, clean, contain, sterilize, neutralize, remediate, dispose, respond to, or assess the effects of an **Infectious Disease** that is a **Widespread Illness**;

    h. use, hiring, retention, or supervision of medical providers actually or allegedly lacking any license, credential, privileges, or registration in violation of the regulations or other laws in force at the time of the alleged act, error or omission, or occurrence in relation to any **Widespread Illness**;

    i. vicarious liability, other derivative liability, or joint and several liability of any **Insured** for or with, any other **Insured**, co-defendant, entity, business, manufacturer, medical care provider, person, or

governmental entity that has been granted, enjoys, claims or asserts **Immunity**; or

j.    acts or omissions resulting in the loss of **Immunity**.

2.    "**Widespread Illness**" means any **Epidemic**, **Pandemic**, or **Scheduled Infectious Disease**.

"**Epidemic**" means a widespread occurrence of an **Infectious Disease** that a **Public Health Authority** has declared to be, or assessed or characterized as, an epidemic in any public statement.

"**Immunity**" means immunity from suit or liability, limitation on liability, or other legal protection against civil or criminal liability afforded to any person or entity pursuant to any statute, regulation, ordinance, executive order, declaration by any federal or state agency, or other applicable law with respect to any **Claim** arising from the provision of **Professional Services** in connection with or in response to any **Widespread Illness.**

"**Pandemic**" means an **Epidemic** that any **Public Health Authority** has declared to be, or assessed or characterized as, a pandemic in any public statement.

"**Public Health Authority**" means any state, federal or local government within the United States of America, including the Center for Disease Control, or any international body, agency or authority, including the World Health Organization, that is tasked with overseeing the public health or is authorized to declare, assess or characterize circumstances as a **Pandemic**, **Epidemic** or widespread occurrence of **Infectious Disease**.

"**Infectious Disease**" means an illness or disease caused by the infection, presence and growth of pathogenic biologic agents in an individual human or other animal host, including but not limited to any bacteria, virus, mold, mildew, fungi, parasite or other vector and which biologic agents or its toxins are directly or indirectly transmitted to infected individuals from an infectious person, consuming contaminated foods or beverages, contact with contaminated body fluids, contact with contaminated inanimate objects, inhalation, being bitten by an infected animal, insect or tick, or other means. **Infectious Disease** includes all **Scheduled Infectious Diseases**.

"**Scheduled Infectious Disease**" means:

a.    the disease known as Coronavirus disease 19 or COVID-19, or any other condition, disease or sickness caused by the virus responsible for COVID-19 or by any mutation of that virus; and

b.          .

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

_____              February 2, 2022
_____
Authorized Representative                                              Date



## IRONSHORE SPECIALTY INSURANCE COMPANY

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 9

**Policy Number:** HC7SACFPT3001                **Effective Date of Endorsement:** January 01, 2022
**Insured Name:** Tewksbury Living Group LLC dba Wood Haven Senior Living

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the above captioned policy.

**A.    Cap on Certified Act of Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.**    The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.**    The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B.    Application of Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

_____                    February 2, 2022
Authorized Representative                                 Date

# IRONSHORE
## A Liberty Mutual Company

## IRONSHORE SPECIALTY INSURANCE COMPANY
175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 10

**Policy Number:** HC7SACFPT3001                    **Effective Date of Endorsement:** January 01, 2022
**Insured Name:** Tewksbury Living Group LLC dba Wood Haven Senior Living

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# DISCLOSURE – TERRORISM RISK INSURANCE ACT

**THIS ENDORSEMENT IS MADE PART OF YOUR POLICY PURSUANT TO THE TERRORISM RISK INSURANCE ACT.**

In accordance with the Terrorism Risk Insurance Act, including all amendments, ("TRIA" or the "Act"), we are required to provide you with a notice of the portion of your premium attributable to coverage for "certified acts of terrorism," the federal share of payment of losses from such acts, and the limitation or "cap" on our liability under the Act.

**Disclosure of Premium**

The Company has made available coverage for "certified acts of terrorism" as defined in the Act.  If purchased, the portion of your premium attributable to coverage for "certified acts of terrorism" is shown in the Declarations, Declarations Extension Schedule or elsewhere by endorsement in your policy.

**Federal Participation In Payment Of Terrorism Losses**

If an individual insurer's losses from certified acts of terrorism exceed a deductible amount specified in the Act, the federal government will reimburse the insurer for the Federal Share  of losses paid in excess of the deductible,  but only if aggregate industry losses from such  acts exceed  the "Program Trigger".

Beginning calendar year 2020, the Federal Share is 80% and Program Trigger is $200,000,000.

**Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to "certified acts of terrorism" exceed $100 billion in a calendar year and we have met our deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion.  Nor shall Treasury make any payment for any portion of the amount of such losses that exceeds $100 billion.  In such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.


_____                    February 2, 2022
Authorized Representative                             Date



## IRONSHORE SPECIALTY INSURANCE COMPANY

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 11

**Policy Number:** HC7SACFPT3001        **Effective Date of Endorsement:** January 01, 2022
**Insured Name:** Tewksbury Living Group LLC dba Wood Haven Senior Living

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# SERVICE OF SUIT CLAUSE – MASSACHUSETTS

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS IN THIS POLICY

Ironshore Specialty Insurance Co. hereby appoints the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute or his successor or successors in office, as the agent upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this contract of insurance.

The Company furthermore designates Corporation Service Company, 84 State Street, Boston, MA 02109 as the agent to whom a copy of the Service of Process should be forwarded by the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in Massachusetts. A copy of any process, "suit", complaint or summons may be made upon the Office of the General Counsel, North America Specialty, Liberty Mutual Insurance, C/O Ironshore Specialty Insurance Co., 175 Berkeley Street, Boston, MA 02116.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

_____
Authorized Representative

February 2, 2022
Date



**IRONSHORE SPECIALTY INSURANCE COMPANY**

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement # 12**

**Policy Number:** HC7SACFPT3001                          **Effective Date of Endorsement:** January 01, 2022
**Insured Name:**  Tewksbury Living Group LLC dba Wood Haven Senior Living

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED ENDORSEMENT

In consideration of the premium charged:

1.  The term "**Insured**," as defined in the Policy, shall be deemed to include each person or entity listed below (each an "**Additional Insured**"), but only with respect to liability of any such **Additional Insured** that is based on or arises out of a **Claim** for which coverage would otherwise be afforded to the original **Insured** under this Policy.

    **Additional Insured(s):**

    - Meridian Senior Living, LLC - 6931 Arlington Road, Suite 320, Bethesda, MD 20814
    - Sino Ocean Meridian Holdings LLC- 6931 Arlington Road, Suite 320, Bethesda, MD 20814
    - KCP Advisory Group, LLC - 700 Technology Park Dr., Billerica, MA 01821

2.  It is understood and agreed that each **Additional Insured** listed above is being afforded coverage under this Policy for any liability incurred *solely* as a result of the acts, errors or omissions of the original **Insured**. No coverage will be available under this Policy for any **Claim** based on or arising out of any actual or alleged independent or direct liability of any **Additional Insured**.

3.  The Insurer will provide the **Additional Insured(s)** identified above with at least ten (10) days' written notice of cancellation or non-renewal of this Policy if such cancellation or non-renewal is for non-payment of premium, or sixty (60) days' written notice of cancellation or non-renewal if such cancellation or non-renewal is for any other reason.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

_____
Authorized Representative

February 4, 2022
Date



**IRONSHORE SPECIALTY INSURANCE COMPANY**

175 Berkeley Street
Boston, MA 02116
Toll Free: (877) IRON411

**Endorsement #** 13

**Policy Number:** HC7SACFPT3001                                      **Effective Date of Endorsement:** January 01, 2022
**Insured Name:**  Tewksbury Living Group LLC dba Wood Haven Senior Living

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# AMEND RETROACTIVE DATE FOR SPECIFIC NAMED INSURED(S)

In consideration of the premium charged, with respect solely to any **Claim** or **Related Claims** under INSURING AGREEMENT A, B or C first made against any **Named Insured** identified below, the applicable **Retroactive Date** shall be the date set forth opposite the name of such **Named Insured.**

| Named Insured | Retroactive Date |
|---|---|
| KCP Advisory Group, LLC | 1/01/2022 |

All other terms and conditions of this Policy remain unchanged.

_____                    February 4, 2022
Authorized Representative                                                          Date

### Liberty Mutual Group California Privacy Notice

Commercial Lines (excluding Workers' Compensation)
(Effective January 1, 2020)

Liberty Mutual Group and its affiliates, subsidiaries, and partners (collectively "Liberty Mutual" or "we", "us" and "our") provide insurance to companies and other insurers.  This Privacy Notice explains how we gather use, and share your data.  This Privacy Notice applies to you if you are a **Liberty Mutual commercial line insured or are a commercial line claimant residing in California.**  It does not apply to covered employees or claimants under Workers' Compensation policies.  If this notice does not apply to you, go to libertymutual.com/privacy to review the applicable Liberty Mutual privacy notice.

### What Data Does Liberty Mutual Gather?

We may collect the following categories of data:

- **Identifiers**, including a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, Social Security Number, driver's license number, or other similar identifiers;
- **Personal information** described in California Civil Code § 1798.80(e), such as your name, signature, Social Security Number, physical characteristics or description, address, telephone number, driver's license or state identification card number, insurance policy number, education, employment, employment history, bank account number, financial information, medical information, or health insurance information;
- **Protected classification characteristics**, including age, race, color, national origin, citizenship, religion or creed, marital status, medical condition, physical or mental disability, sex (including gender, gender identity, gender expression, pregnancy or childbirth and related medical conditions), sexual orientation, or veteran or military status;
- **Commercial information**, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories and tendencies;
- **Internet or other similar network activity**, including browsing history, search history, information on a consumer's interaction with a website, application, or advertisement;
- **Professional or employment related information**, including current or past job history or performance evaluations;
- **Inferences drawn from other personal information**, such as a profile reflecting a person's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes;
- **Risk data**, including data about your driving and/or accident history; this may include data from consumer reporting agencies, such as your motor vehicle records and loss history information, health data, or criminal convictions; and
- **Claims data**, including data about your previous and current claims, which may include data regarding your health, criminal convictions, third party reports, or other personal data.

For information about the types of personal data we have collected about California consumers in the past twelve (12) months, please go to libertymutual.com/privacy and click on the link for the California Supplemental Privacy Policy.

### How We Get the Personal Data:

| We gather your personal data **directly from you**. For example, you provide us with data when you: | We also gather your personal data **from other people**. For example: |
|---|---|
| ▪ ask about, buy insurance or file a claim | ▪ your insurance agent or broker |

1

| | |
|---|---|
| ▪ pay your policy | ▪ your employer, association or business (if you are insured through them) |
| ▪ visit our websites, call us, or visit our office | ▪ our affiliates or other insurance companies about your transactions with them |
| | ▪ consumer reporting agencies, Motor Vehicle Departments, and inspection services, to gather your credit history, driving record, claims history, or value and condition of your property |
| | ▪ other public directories and sources |
| | ▪ third parties, including other insurers, brokers and insurance support organizations who you have communicated with about your policy or claim, anti-fraud databases, sanctions lists, court judgments and other databases, government agencies, open electoral register or in the event of a claim, third parties including other parties to the claim witnesses, experts loss adjustors and claim handlers |
| | ▪ other third parties who take out a policy with us and are required to provide your data such as when you are named as a beneficiary or where a family member has taken out a policy which requires your personal data |

For information about how we have collected personal data in the past twelve (12) months, please go to libertymutual.com/privacy and click on the link for the California Supplemental Privacy Policy.

## How Does Liberty Mutual Use My Data?

Liberty Mutual uses your data to provide you with our products and services, and as otherwise provided in this Privacy Notice.  Your data may be used to:

| Business Purpose | Data Categories |
|---|---|
| **Market, sell and provide insurance.**  This includes for example:<br>• calculating your premium;<br>• determining your eligibility for a quote;<br>• confirming your identity and service your policy; | • Identifiers<br>• Personal Information<br>• Protected Classification Characteristics<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information<br>• Risk data<br>• Claims data |
| **Manage your claim.**  This includes, for example:<br>• managing your claim, if any;<br>• conducting claims investigations;<br>• conducting medical examinations;<br>• conducting inspections, appraisals;<br>• providing roadside assistance;<br>• providing rental car replacement, or repairs; | • Identifiers<br>• Personal Information<br>• Protected Classification Characteristics<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information<br>• Risk data |

2

| | |
|---|---|
| | • Claims data |
| **Day to Day Business and Insurance Operations.** This includes, for example: <br> • creating, maintaining, customizing and securing accounts; <br> • supporting day-to-day business and insurance related functions; <br> • doing internal research for technology development; <br> • marketing and creating products and services; <br> • conducting audits related to a current contact with a consumer and other transactions; <br> • as described at or before the point of gathering personal data or with your authorization; | • Identifiers <br> • Personal Information <br> • Protected Classification Characteristics <br> • Commercial Information <br> • Internet or other similar network activity <br> • Professional or employment related information <br> • Inferences drawn from other personal information <br> • Risk data <br> • Claims data |
| **Security and Fraud Detection.** This includes for example: <br> • detecting security issues; <br> • protecting against fraud or illegal activity, and to comply with regulatory and law enforcement authorities; <br> • managing risk and securing our systems, assets, infrastructure and premises; roadside assistance, rental car replacement, or repairs <br> • help to ensure the safety and security of Liberty staff, assets and resources, which may include physical and virtual access controls and access rights management; <br> • supervisory controls and other monitoring and reviews, as permitted by law; and emergency and business continuity management; | • Identifiers <br> • Personal Information <br> • Protected Classification Characteristics <br> • Commercial Information <br> • Internet or other similar network activity <br> • Professional or employment related information <br> • Inferences drawn from other personal information <br> • Risk data <br> • Claims data |
| **Regulatory and Legal Requirements.** This includes for example: <br> • controls and access rights management; <br> • to evaluate or conduct a merger, divestiture, restructuring, reorganization, dissolution, or other sale or transfer of some or all of Liberty's assets, whether as a going concern or as part of bankruptcy, liquidation, or similar proceeding, in which personal data held by Liberty is among the assets transferred; <br> • exercising and defending our legal rights and positions; <br> • to meet Liberty contract obligations; <br> • to respond to law enforcement requests and as required by applicable law, court order, or governmental regulations; <br> • as otherwise permitted by law. | • Identifiers <br> • Personal Information <br> • Protected Classification Characteristics <br> • Commercial Information <br> • Internet or other similar network activity <br> • Professional or employment related information <br> • Inferences drawn from other personal information <br> • Risk data <br> • Claims data |

3

Version 1.0 (last updated October 13, 2019)

| | |
|---|---|
| **Improve Your Customer Experience and Our Products.** This includes for example: <br>• improve your customer experience, our products and service; <br>• to provide, support, personalize and develop our website, products and services; <br>• create and offer new products and services; | • Identifiers <br>• Personal Information <br>• Commercial Information <br>• Internet or other similar network activity <br>• Professional or employment related information <br>• Inferences drawn from other personal information <br>• Risk data <br>• Claims data |
| **Analytics to identify, understand and manage our risks and products.** This includes for example: <br>• conducting analytics to better identify, understand and manage risk and our products; | • Identifiers <br>• Personal Information <br>• Protected Classification Characteristics <br>• Commercial Information <br>• Internet or other similar network activity <br>• Professional or employment related information <br>• Inferences drawn from other personal information <br>• Risk data <br>• Claims data |
| **Customer service and technical support.** This includes for example: <br>• answer questions and provide notifications; <br>• provide customer and technical support; | • Identifiers <br>• Personal Information <br>• Commercial Information <br>• Internet or other similar network activity <br>• Professional or employment related information <br>• Inferences drawn from other personal information <br>• Risk data <br>• Claims data |

## How Does Liberty Mutual Share My Data?

Liberty Mutual does not sell your personal data as defined by the California Consumer Privacy Act.

Liberty Mutual shares personal data of California consumers with the following categories of third parties:

- Liberty Mutual affiliates;
- Service Providers;
- Public entities and institutions (e.g. regulatory, quasi-regulatory, tax or other authorities, law enforcement agencies, courts, arbitrational bodies, and fraud prevention agencies);
- Professional advisors including law firms, accountants, auditors, and tax advisors;
- Insurers, re-insurers, policy holders, and claimants; and
- As permitted by law.

Liberty Mutual shares the following categories of personal data regarding California consumers to service providers for business purposes:

| | |
|---|---|
| Identifiers | Personal Data; |
| Protected Classification Characteristics; | Commercial Information; |
| Internet or other similar network activity; | Claims Data; |
| Inferences drawn from other personal information; | Risk Data; |
| Professional, employment, and education information; | |

Version 1.0 (last updated October 13, 2019)

For information about how we have shared personal information in the past twelve (12) months, please go to libertymutual.com/privacy and click on the link for the California Supplemental Privacy Policy.

## What Privacy Rights Do I Have?

The California Consumer Privacy Act provides California residents with specific rights regarding personal information.  These rights are subject to certain exceptions. Our response may be limited as permitted under law.

### Access or Deletion

You may have the right to request that Liberty Mutual disclose certain information to you about our collection and use of your personal data in the twelve (12) months preceding such request, including a copy of the personal data we have collected. You also may have the right to request that Liberty Mutual delete personal data that Liberty Mutual collected from you, subject to certain exceptions.

Specifically, you have the right to request that we disclose the following to you, in each case for the twelve (12) month period preceding your request:

- the categories of personal data we have collected about you;

- the categories of sources from which the personal data was/is collected;

- our business or commercial purpose for collecting personal data;

- the categories of third parties with whom we share personal data;

- the specific pieces of data we have collected about you;

- the categories of personal data about you, if any, that we have disclosed for monetary or other valuable consideration, including the categories of third parties to which we have disclosed the data, by category or categories of personal data for each third party to which we disclosed the personal data; and

- the categories of personal data about you that we disclosed for a business purpose.

**You can make a request by either:**

Calling: 800-344-0197

Online:  libertymutualgroup.com/privacy-policy/data-request

Mail:    Liberty Mutual Insurance Company
         175 Berkeley St., 6th Floor
         Boston, MA 02116
         Attn:  Privacy Office

You may also make a verifiable consumer request on behalf of your minor child.

You or your authorized agent may only make a verifiable consumer request for access or data deletion twice within a twelve (12) month period. The verifiable consumer request must provide sufficient information that allows Liberty Mutual to reasonably verify that you are the person about whom Liberty Mutual collected personal data or an authorized representative of such person; and describe your request with sufficient detail that allows Liberty Mutual to properly understand, evaluate, and respond to it.  For more information about how Liberty Mutual will verify your identity and how an authorized agent may make a request on your behalf, go to libertymutual.com/privacy and click on the California Supplemental Privacy Policy.

**Response Timing**

Version 1.0 (last updated October 13, 2019)

Liberty Mutual will respond to a verifiable consumer request within forty-five (45) days of its receipt. If more time is needed, Liberty Mutual will inform you of the reason and extension period in writing.

Any disclosures that will be provided will only cover the twelve (12) month period preceding our receipt of the verifiable consumer request. If Liberty Mutual is unable to fulfill your request, you will be provided with the reason that the request cannot be completed. For more information about how we will respond to requests, go to libertymutual.com/privacy and click on the California Supplemental Privacy Policy.

**Rights to opt in and out of data selling**

California consumers have the right to direct businesses not to sell your personal data (opt-out rights), and personal data of minors under 16 years of age will not be sold, as is their right, without theirs or their parents' opt-in consent. Liberty Mutual does not sell the personal data of consumers. For more information, go to libertymutual.com/privacy and click on the California Supplemental Privacy Policy.

**No account needed**

You do not need to create an account with Liberty Mutual to exercise your rights. Liberty Mutual will only use personal data provided in a request to review and comply with the request.

**No discrimination**

You have the right not to be discriminated against for exercising any of your CCPA rights. Unless permitted by the CCPA, exercising your rights will not cause Liberty Mutual to:

- Deny you goods or services;
- Charge you different prices or rates for goods or services, including through granting discounts or other benefits, or imposing penalties;
- Provide you a different level or quality of goods or services; or
- Suggest that you may receive a different price or rate for goods or services, or a different level or quality of goods or services.

**Will Liberty Mutual Update This Privacy Notice?**

We reserve the right to makes changes to this notice at any time and for any reason. The updated version of this policy will be effective once it is accessible. You are responsible for reviewing this policy to stay informed of any changes or updates.

**Who Do I Contact Regarding Privacy?**

If you have any questions or comments about this Notice or the Supplemental CCPA Notice, your rights, or are requesting the Notice in an alternative format, please do not hesitate to contact Liberty Mutual at:

**Phone**:          800-344-0197

**Email**:          privacy@libertymutual.com

**Postal Address**:          Liberty Mutual Insurance Company
175 Berkeley St., 6th Floor
Boston, MA 02116
Attn: Privacy Office

Version 1.0 (last updated October 13, 2019)